## Elliott v. Commonwealth.

(Decided March 14, 1913.)

## Appeal from Graves Circuit Court.

1. Homicide—Evidence—Unsatisfactory Character of—Instructions— Self Defense Instruction.—Upon the trial of appellant, who with Wadlington and Magness was charged with the murder of Dallas, he was found guilty of murder and his punishment fixed at confinement in the penitentiary for life. This was his second trial, the jury having disagreed upon the first trial. The evidence is unsatisfactory. All the parties were more or less under the influence of liquor at the time. Wadlington and appellant each admitted having done the killing. On the first trial appellant testified that he had done it and relied upon self defense, but at the last trial he stated that his former statement was made because he had a good defense, and Wadlington did not, and that the latter did the shooting. All the circumstances show that appellant was attempting to avoid trouble between Wadlington and deceased; no motive is shown except in Wadington and no threat except in him. There is some additional evidence upon self defense, though of an unsatisfactory character.

2. Although requested by appellant to give the whole law of the case the lower court declined to give a self defense instruction. Held, That while appellant testified that he did not shoot deceased, the jury might have believed that he did shoot him, and yet might have believed from all the facts and circumstances that he had shot him in self defense. Under such circumstances he was entitled to an instruction upon self defense.

3. Homicide—Instructions.—The rule has been uniformly followed in this court that where no eye witness is introduced, the court should give in the instructions the law applicable to murder, manslaughter and self defense, so that the jury might find from all the circumstances the state of fact that existed.

W. S. FOY, W. H. HESTER for appellant.

JAMES GARNETT, Attorney General, OVERTON S. HOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE TURNER—Reversing.

Appellant together with Benton Wadlington and Jack Magness was charged in an indictment returned in the Graves Circuit Court with the murder of John Dallas; in separate counts they were each charged as principals and the other two as conspirators.

Appellant being on separate trial at a special term in July, 1912, the jury disagreed, and thereafter, in No-

vember, 1912, he was again tried and found guilty of murder, and his punishment fixed at confinement in the penitentiary for life. His motion and grounds for a new trial having been overruled, he prosecutes this appeal.

On Saturday night in the latter part of June, 1912, Benton Wadlington and John Dallas together with some other parties were engaged in gambling and drinking a greater part of the night at Dukedom, a town on the State line between Kentucky and Tennessee, in the extreme southern part of Graves County; during the progress of their carousal, Dallas either won from, or bought, or in some way came into possession of Wadlington's pistol. Appellant and Magness while residents of Dukedom had that Saturday afternoon gone to Fulton, Kentucky, about nine miles away and remained there all night, returning in the early hours of the morning to Dukedom: being absent from the town during the time of the transactions between Wadlington and Dallas, they of course knew nothing of them. Upon their return the next morning they met Wadlington, Dallas and others, and went into the store or place of business of Wadlington on the State line road where it appears he kept a stock of liquors. After drinking there they all left the place, Dallas being among the first to leave, and appellant and Wadlington the last. As the latter two came out of the place, they observed that Dallas, who lived out some two or three miles in the country, had gotten into his buggy and was driving towards his home.

Shortly thereafter, Wadlington and Magness started in Magness' buggy in the same direction and invited appellant to go with them, which he did. Appellant claims that at the time he knew of no unpleasantness or difficulty of any kind between Wadlington and Dallas, and testified that Wadlington told him he was going out to see a man by the name of Starks on business; and that the first he knew of the controversy was when about two miles in the country they overtook Dallas standing in the road talking to a man, and Wadlington referring to Dallas said: "That is the son of a bitch I am looking for." They drove up to where Dallas and the other man were talking, and shortly thereafter Dallas continued on his way, and they proceeded to go in the same direction.

They again overtook Dallas near the home of a man named Caldwell, and Wadlington accosted Dallas, and

they stopped their buggies, and Wadlington got out of the buggy in which he, appellant, and Magness were riding, and got into the buggy with Dallas. Wadlington demanded of Dallas the return of his pistol, and Dallas declined to give him the same unless he would pay him his $10.00 back. That Wadlington declined to do saying Dallas owed him $60.00 with three years' interest on it, and then Wadlington drew his automatic revolver and placed it against Dallas' side, and told him, that if he did not return his revolver he would kill him.

Appellant then got out of the buggy where he was, and went up to the buggy where Wadlington and Dallas were, and persuaded Dallas to give up the pistol, saying to him, that the matter could be settled at some other time. This Dallas finally agreed to and did. The parties then drove a short distance to the Caldwell house, and appellant and Magness went around to the cistern to get a drink of water, and Dallas went into the house, and went to the telephone with the avowed purpose of calling an officer and having Wadlington arrested for robbing him, as he charged. It appears that the telephone in the house was very near a window, and appellant upon going around the house found Wadlington at the widow with a pistol in his hand, and vowing that if Dallas charged him with robbery, or undertook to call an officer to have him arrested, that he would shoot him away from the telephone. Appellant thereupon persuaded Wadlington from carrying out his expressed purpose, and finally induced him to turn over the pistol to him, appellant.

Dallas, either by reason of his failure to get the officer over the phone, or having changed his mind, left the Caldwell house. This locality was in the general neighborhood of Dallas' home, and when they started to leave there, he expressed a purpose to return to Dukedom, and there cause Wadlington's arrest; appellant undertook to persuade him not to return to Dukedom, but to go to his home; but when he expressed his determination to do so, Dallas and appellant got into Dallas' buggy and returned to that place together, Wadlington and Magness driving along behind them in the other buggy.

When they reached Dukedom, before they got out of the buggy, appellant again undertook to persuade Dallas not to have anything further to do with Wadlington, as he was drinking and was liable to kill him,

and told him that Wadlington had already threatened his life that day; but Dallas persisted in his determination, and went into the store and undertook again to call an officer, at which time appellant again said to him in the presence of two witnesses, that he was fixing to get killed. Failing to get an officer over that phone, Dallas left the store for the purpose of going to another phone, and attempting to get him over a different line, and while he was gone Wadlington and Magness came along, and appellant went with them to a barn about one hundred yards distant for the purpose of feeding the horse. Upon the return of Dallas to the store, he inquired where the other three had gone, and upon being informed that they had gone up to the barn, he immediately started in that direction, and said there was going to be trouble right away. When he reached the barn the other three parties were there, and a few minutes later a pistol shot was heard, he was mortally wounded, and died in an hour or so thereafter.

As to what occurred in the barn we are left entirely to the testimony of appellant, as on the trial Wadlington was not offered as a witness by either party, and Magness though being introduced by appellant declined to answer all questions.

It is apparent from the whole testimony that all the parties had been on a debauch the night before, and were all more or less under the influence of liquor, and Wadlington and Dallas especially were drunk.

Some two or three witnesses testified that shortly after the shot was fired, they saw appellant standing at or near the doors of the barn with a pistol in his hand, and this is explained by appellant in this way: That immediately after Wadlington fired the shot that killed Dallas, he pitched the pistol up into the buggy, which they had recently vacated, pulled his knife from his pocket, opened it, and threw it down beside the body of Dallas, saying "That they could then prove self defense;" that Wadlington then left, and at the suggestion of Magness, he (appellant) picked up Wadlington's pistol from the buggy seat, and walked around toward the front door with it in his hand, and that was when the witness saw him; that on that same day he took the pistol to Wadlington's home, and delivered it to Wadlington's wife in his presence, and it is a most significant fact that this

statement of appellant is not denied either by Wadlington or his wife.

There is evidence that on the day of the shooting each Wadlington and appellant admitted having done it. On the first trial appellant testified that he had done the shooting and relied upon self-defense; but at the last trial he explains that by saying that Wadlington and his wife and his father-in-law, and other relatives had persuaded him into making that statement upon the idea that as Dallas was trying to injure him (appellant) at the time Wadlington shot him, that he, appellant, had a good defense, and Wadlington did not; and this testimony was not denied by any of them, although at least two of Wadlington's relatives so accused, testified on the trial for the Commonwealth.

The transcript of the testimony on the first trial does not appear in this record, but only detached statements from it.

Appellant testified that before they went to the barn, he offered to return the pistol to Wadlington which he had gotten from him out at the Caldwell house, and Wadlington declined to take it because he said it was not his, but belonged to a man by the name of Bennett, who was present, and that he turned it over to Bennett. This statement is, however, denied by Bennett.

Appellant's version of what happened in the barn is about this: That Dallas came in and attacked Magness for letting Wadlington have his horse and buggy to overtake him, and that Dallas and Magness were having some difficulty when he walked up and asked Dallas not to hit the boy, saying to him, that he (Magness) was only seventeen years old and was drinking; that Dallas then wanted to know what in the hell it was to him, and run his hand in his pocket and started toward him, and that he, appellant, backed off, and backed into one of the buggy wheels, and fell over it, and about that time Wadlington said: "Clarence, don't run, I will stop him," and immediately fired.

No single witness undertook to give any different statement of how the shooting occurred, the whole testimony of the Commonwealth being circumstantial.

No fact or circumstance in the record discloses any ill feeling on that day, or at any time, between appellant and Dallas; on the contrary it appears that they had always been friendly. All the circumstances show that appellant

was attempting all the time to avoid the threatened trouble between Dallas and Wadlington; no motive is shown in any one except Wadlington; no threat by any except Wadlington.

Magness swore in an affidavit for continuance sworn to by both him and appellant filed at a prior term which was offered and read in evidence by the Commonwealth against appellant, that neither he or appellant shot Dallas, but that he was shot while advancing upon appellant in a menacing attitude in such a way as would have authorized appellant to shoot him in self-defense.

The Commonwealth witness, Tarry, testified that just after the shooting, appellant said to him that he had shot Dallas, but that he had to do it to keep Dallas from killing him.

The lower court although requested by appellant to give the whole law of the case declined to give an instruction on self defense.

In the case of Rutherford v. Commonwealth 13 Bush 608, the rule is laid down that where no eye witness is introduced, the court should give in the instructions the law applicable to murder, manslaughter and self-defense, so that the jury might find from all the circumstances in evidence the state of fact that existed; and that rule has been uniformly followed since in this court, and has only been modified (Bass v. Commonwealth 124 Ky. 760), to the extent that where the physical facts are such as to preclude the idea that there was a struggle or any resistance offered by the deceased at the time his life was taken, the trial court would be justified in refusing to give an instruction on self-defense. In the latter case all of the Kentucky cases on this subject are reviewed. It is true that appellant testified that he did not shoot Dallas, but in spite of his testimony the jury might have believed that he did shoot him, and yet might have believed from all the facts and circumstances, and from the the statements of the witnesses who testified to admissions of appellant, that he had shot him in self-defense, and under such circumstances, he was entitled to an instruction on self-defense. But in this case we are not left entirely to speculation, for we not only have the testimony of appellant, but also the statements of appellant and Magness, in their affidavit introduced as evidence by the Commonwealth, and the statements of witnesses as to admissions of appellant, which show the commission

of the crime, under such circumstances as fully justify the giving of the instruction on self-defense. The other errors complained of it is unnecessary to notice, as upon a retrial they could hardly occur again.

Nothing in this opinion is intended to pass upon the sufficiency of the evidence to sustain a conviction.

The judgment is reversed with directions to grant appellant a new trial, and for further proceedings consistent herewith.