## Stanley and Nix v. Commonwealth.

(Decided May 9, 1919.)

### Appeal from Harlan Circuit Court.

1. Homicide—Evidence—Instructions.—In prosecutions under an indictment for murder where the testimony is entirely circumstantial with no eyewitness to the killing, it is the duty of the court to instruct the jury upon the whole law of the case, including one on manslaughter and self-defense, unless the circumstances and physical facts are such as to preclude the possibility of the homicide being committed in any other way except with malice aforethought, in which case no instruction upon self-defense, nor upon any degree of offense less than murder should be given.

2. Homicide—Evidence.—While it is extremely doubtful whether the evidence in this case was sufficient to authorize a verdict of conviction, that question is not decided, since there will have to be a new trial, in which the Commonwealth might strenghten its evidence.

HALL & JONES for appellants.

CHARLES H. MORRIS, Attorney General, and OVERTON S. HOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellants, Marshall Stanley and Will Nix, together with two others, Major Kitchen and Baby Britt, alias Will Smith, were indicted by the grand jury of Harlan county for the murder of Shelby Turner, and upon their separate trials they were found guilty and their punishment fixed by the verdict at confinement in the penitentiary during their natural lives, upon which verdict the court pronounced judgment and their motion for a new trial having been overruled, they prosecute this appeal. The prosecution against the other two accused was dismissed. A number of errors are relied on as grounds for sustaining the motion, but all of them except two appear to be formal and without merit, those two being (1) the failure of the court to instruct the jury upon the crime of voluntary manslaughter and to give it the self-defense instruction; and (2) that the evidence is insufficient to sustain the verdict and that the verdict is flagrantly against the evidence. A consideration of the points made call for a brief statement of the facts.

The deceased, Shelby Turner, was a white man who held the position of chief of police of the mining town of Benham. In the early part of the Saturday evening upon which the homicide occurred, the appellants, with their codefendants in the indictment, and a number of other persons, aggregating some fifteen or more, all of whom were colored, gathered at a colored boarding house which was run by a woman named Goldy. Among the number present was a colored man by the name of Pink O'Neil. The crowd had what appears to be sufficient quantities of both beer and whiskey. About eight o'clock p. m. the deceased appeared, and, according to the evidence, he and all the members of the crowd, except perhaps the appellant, Nix, participated more or less freely in consuming the beer and whiskey. Not long after the arrival of the deceased he became intoxicated and laid down on a bed in the front room, the head of which was near the front door. There were but two other rooms located at the rear of the front one, and a small front porch. The rear room was used for a kitchen and dining room, while the middle and front ones were bed rooms. About the time the deceased laid down in the front room he gave his pistol and watch to the appellant, Marshall Stanley, saying at the time that he knew Stanley was honest and would take care of them and account for them. About the same time Pink O'Neil had imbibed sufficiently to

retire, and he occupied a bed in the middle room, a door to which led into the front room, and which door was open. Before this, however, some trifling dispute had arisen between the deceased and Pink O'Neil, resulting in the former striking the latter over the head with his pistol or billy. The crowd remained there, occupying principally the front room, until twelve o'clock, when all of them except the two who had retired repaired to a dance that was being conducted about 250 yards away, and which had been in progress since early evening, where they remained until between one and two o'clock, at which time the dance broke up and the crowd dispersed. Before leaving the boarding house, the appellant, Will Nix, and another member of the crowd, Cass Sharp, locked the front door, leaving the deceased and Pink O'Neil in the house, occupying their respective beds. After leaving the dance the crowd went to the house of a woman named Arella Jones, located near if not adjoining the Goldy boarding house, where it was reported there was some beer and a piano, and at which place it was intended to continue the dance. That house soon became so filled that neither of the defendants nor the woman Goldy were able to get in. In the meantime the defendant, Nix, had given the key to the woman, Goldy, and after it was ascertained that they could not get in the house of Arella Jones those two went to the Goldy boarding house, the landlady opened the door and there discovered that the deceased had been struck by the side of the head with an ax, a gash cut in the side of the neck, and there was blood all over the bed, the walls and the floor, and he in an unconscious condition from which he never recovered, although he was removed shortly thereafter to a hospital maintained by the mining company near by. The door between the room occupied by the deceased and the one occupied by Pink O'Neil was still open, and the latter was in his bed. He immediately got up and stated he did not know who had committed the deed, but that Baby Britt, alias Will Smith (one of the defendants in the indictment), who was not seen at the dance, and who was the lessee of the boarding house and boarded there, had come into the house after the crowd had left for the dance and inquired of him (O'Neil) the cause of a knot on his (O'Neil's) head, and being informed as to its cause he remarked in substance that he would not allow any such thing as that to go on in his

house, and later requested O'Neil to get up; upon being informed that he was too drunk Britt then said: "Well, lay still then. It is all over with now." It further appears that after the difficulty with O'Neil the deceased before lying down was sitting on a trunk with his pistol in his hand and was scribbling on a piece of paper on the lid of the trunk and remarked: "That is all right; I will get him," and then put the piece of paper in his pocket.

It is shown by the witnesses for the Commonwealth that both appellants were at the dance and were seen on the way therefrom, though some of the witnesses say that there was a space of about ten minutes after the breaking up of the dance when they did not see the appellant, Nix. One witness testified that before he heard of the homicide he saw Major Kitchen with what witness thought was blood on his hand and coat sleeve. After the deceased had been taken to the hospital another witness testified to seeing some blood on the hand of the appellant, Marshall Stanley. Another witness testified to having seen some blood on the hand of Will Nix, but no blood was seen on the hand or any part of the person or clothing of either Stanley or Nix until after the deceased had been taken to the hospital, and both of the accused assisted in lifting the deceased from the bed and handled some of the bloody bedclothing in fixing the stretcher upon which deceased was carried to the hospital, thus accounting for the blood seen upon them.

Another witness testified that in the afternoon before the night of the killing he saw the appellant, Nix, pay to the deceased $10.00, when deceased exhibited his pocket book, but it is not shown how much, if any, money was in it, nor does it appear whether the deceased at the time of the killing had a pocketbook, how much it contained, or whether he had any money elsewhere upon his person, and if so whether it had been taken. The two appellants are shown to have been good friends of the deceased and to have possessed a good reputation in that community for peace and quietude. The house in which the homicide occurred is owned by the mining company, and a number of the same kind are located contiguous to each other. They are all equipped with similar locks and one key will fit the locks on all the houses.

From this brief statement of the facts it is at once apparent that the evidence (if indeed it could be said

there was any looking to the guilt of appellants) is entirely circumstantial. The rule as frequently announced by this court is that in cases of homicide, where the evidence is entirely circumstantial, and no eyewitness testifies to the killing, and if the circumstances and physical facts do not unerringly point out the degree of the offense, it is the duty of the court to give the whole law of the case to the jury by instructions, including one on self-defense. Rutherford v. Comlth., 13 Bush 608; Brown v. Comlth., 117 Ky. 766; McDowell v. Comlth., 4 Ky. Law Rep. 354; Frazier v. Comlth., 114 S. W. Rep. (Ky.) 268; Ratchford v. Comlth., 16 Ky. Law Rep. 411; Messer v. Comlth., 25 Ky. Law Rep. 700; Same v Same, 27 Ky. Law Rep. 527; Same v. Same, 28 Ky. Law Rep. 920; Greer v. Comlth., 111 Ky. 93; Elliott v. Comlth., 152 Ky. 791; Madison v. Comlth., 13 Ky. Law Rep, 313, and many other cases which might be cited.

There is also a class of cases from this court holding that although the evidence may be circumstantial only, yet if the physical facts and circumstances are sufficient to show that there could be no reasonable conclusion drawn by the jury except that the perpetrator was guilty of murder only, then the court would not be required to give either a manslaughter or a self-defense instruction. This class of cases is set forth and reviewed in the case of Bast v. Comlth., 124 Ky. 747. The distinction between a case when the court should and should not give to the jury instructions upon voluntary manslaughter and self-defense is summed up in that case in this language:

"That this court has held with a degree of uniformity that it is the duty of the trial court to give to the jury all the law of the case, as warranted by the facts and circumstances proven; and in those cases in which the physical facts show that the homicide could not have occurred in a particular way, then it is not the duty of the trial court to give to the jury the law on that phase of the case. Where the physical facts are such as to preclude the idea that there was a struggle or any resistance offered, whatever, by the deceased, at the time that his life was taken, the trial court would be fully justified and warranted in refusing to give an instruction on self-defense. And, again, where the physical facts, as in the case before us, are such as to preclude the idea or the possibility that the killing was the result of an accident, or that it was the result of a sudden affray, then the

trial court would be warranted in refusing to give an instruction on the subjects of voluntary or involuntary manslaughter. This point is aptly illustrated in the case where an infant of tender age is murdered by having its throat cut while lying in its crib. Most assuredly no instruction in a case of this kind would be given upon the subjects of voluntary or involuntary manslaughter, or self-defense; and yet, if the position taken herein by appellant is tenable, this would have to be done. The same would be true in case a helpless paralytic should be murdered. And not unlike the case of the infant or the paralytic is the case before us. James R. York, an old man borne down by the weight of years, while lying upon a couch in the hallway of his own home, was foully murdered by an assasin with a gun, the whole top of his head being blown off and, as shown by the testimony of the coroner, his death was instantaneous. He was unaware of the assassin's presence. He never moved after he received the fatal shot. The killing was done with a gun stolen from a neighbor's house, and a time selected when it was known he would be alone.''

In the Elliott case, *supra,* in discussing the rule first adopted in the Rutherford case requiring the court to instruct the jury upon all phases of homicide, this court said: ''And that rule has been uniformily followed since, in this court, and has only been modified (Bast v. Comlth., 124 Ky. 760) to the extent that where the physical facts are such as to preclude the idea that there was a struggle or any resistance offered by the deceased at the time his life was taken, the trial court would be justified in refusing to give the instruction on self-defense.''

As indicated by the last excerpt, in some of the cases requiring the whole law to be given the physical facts disclose that there were indications of a struggle which negatived the idea that the homicide was committed with malice aforethought, while in other cases in which it was held that only the murder instruction should be given the physical facts were that the deceased was in such a condition either because of infirmity growing out of old age, or other physical causes, or because of extreme youth, was incapable of offering resistance so as to reduce the homicide to one committed under sudden heat and passion, upon great provocation, or in self-defense, and it was therefore not error to give an instruction upon those

phases of the case. The general rule as announced in the Rutherford case, and others following it, is based upon the idea that the jury are the judges of the facts, and unless there is some circumstance or physical fact in the case which would preclude the idea of any less offense than murder, the jury would be authorized to find that the homicide was committed under circumstances that would reduce it to manslaughter, or under circumstances that would excuse defendant under the right of self-defense as well as under circumstances that would make it murder. We think the facts of this case come within the latter rule, since there are no physical facts or circumstances which would exclude every hypothesis except murder. The case before us is different from the Bast case and others holding to the rule therein announced. The deceased here was not physically infirm, either by age or disease; neither was he of such tender years that he could not produce a condition which would excuse defendant under the right of self-defense, or a situation in which the killing might have been committed so as to reduce the crime to manslaughter. Blood was scattered on the walls and over the floor, which might be said to indicate that a struggle had been engaged in. The deceased had on the night of the killing breathed threats against some one when he said: "That is all right; I will get him," thus indicating that he himself might have been the aggressor in the difficulty resulting in his death. After a review of all the cases, we unhesitatingly conclude that it was the duty of the court to give the jury an instruction upon voluntary manslaughter as well as one presenting the right of self-defense. This does not militate against the doctrine of the case of Frasure v. Comlth., 169 Ky. 620, since the defendant testified therein as an eyewitness to the transaction, and besides, in that case the deceased was a girl of tender years and incapable of committing a dangerous assault upon defendant.

(2) In reviewing this record it is difficult to discover from the testimony anything more than a mere possibility that defendants committed the crime with which they are charged. O'Neil, who was not even indicted, not only had a motive which neither of the appellants had, but he was the only one present or in the house at the time of the homicide, unless his story that Baby Britt, alias Will Smith, appeared in the house while the crowd was away at the dance. If that story were true, then

O'Neil and Smith both had a much more favorable opportunity to commit the deed than either of the appellants, and in addition each had a weak though unjustifiable motive for committing it. We seriously doubt whether the evidence was sufficient to authorize the conviction, but since there will have to be another trial at which the evidence may be strengthened, we will not pass upon that question on this appeal.

For the error committed in not giving an instruction upon voluntary manslaughter and one upon self-defense (there being no testimony authorizing an instruction upon involuntary manslaughter) the judgment is reversed, with directions to grant a new trial, and for proceedings consistent herewith.