# STATE *v.* OSCHOA

## No. 2717

January 12, 1926.                                    242 P. 582.

1. CRIMINAL LAW—WHEN ALIBI IS COMPLETE, STATED.
   Alibi is not complete unless it reasonably appears therefrom that defendant could not have been at place of crime.

2. CRIMINAL LAW—PECULIARITIES OF EXPRESSION HELD NOT SUFFICIENT TO WARRANT DISREGARD OF TESTIMONY.
   Contradictory statements of illiterate Indian woman, which were seemingly characteristic and mere peculiarities of expression, *held* not sufficient alone to warrant jury in disregarding testimony.

3. HOMICIDE—EVIDENCE HELD SUFFICIENT TO ESTABLISH KILLING BY ACCUSED.
   Evidence *held* sufficient to justify jury in conclusion that accused, charged with murder, killed deceased.

4. CRIMINAL LAW—SHIRT HELD MATERIAL EVIDENCE IF RENTS IN IT CORRESPOND TO ACCUSED'S SCAR.
   Where defendant told witness that deceased cut his arm, and evidence pointed to struggle, blood-stained shirt *held* material as tending to identify accused as guilty person if scar on accused's arm corresponded to rent in shirt.

5. CRIMINAL LAW—WEIGHT AS EVIDENCE OF SHIRT FOUND AT SCENE OF CRIME QUESTION FOR JURY.
   Where shirt found at scene of killing was introduced in evidence and accused forced to put it on in effort to establish connection between scar on his arm and rent in shirt, weight of such evidence was for jury.

6. CRIMINAL LAW—EVIDENCE OF SHIRT FOUND AT SCENE OF KILLING HELD HARMLESS ERROR.
   Where defendant charged with murder was forced to put on shirt found at scene of killing in effort to establish connection between scar on his arm and rent in shirt, admission of shirt in evidence was error, but harmless if there was no correspondence.

7. INDICTMENT AND INFORMATION—ONE CHARGED WITH MURDER MAY BE FOUND GUILTY OF INVOLUNTARY MANSLAUGHTER.
   In view of criminal practice act, sec. 369, as amended by Stats. 1919, c. 232, sec. 65, providing defendant may be found guilty of any offense included in that charged, one charged with murder may be found guilty of involuntary manslaughter.

8. HOMICIDE—ACCUSED CANNOT COMPLAIN OF CONVICTION OF MANSLAUGHTER ON EVIDENCE WARRANTING CONVICTION FOR MURDER.
   Where defendant charged with murder conceded that killing amounted at least to second degree murder, and that circumstances would aggravate rather than mitigate offense, he could not be heard to complain because jury found him guilty of involuntary manslaughter.

9. HOMICIDE—INSTRUCTION AS TO ALL GRADES OF HOMICIDE HELD PROPER WHERE MURDER WAS CHARGED.
   Where, in prosecution for murder, deceased was found dead, having been shot twice, and there was evidence of hard struggle

with slayer. but no eyewitness, court properly instructed jury as to all grades of homicide.

10. CRIMINAL LAW—COMPELLING ACCUSED TO DON SHIRT FOUND AT SCENE OF KILLING HELD PROPER.

Compelling defendant, accused of murder, to remove shirt to exhibit scars and to don shirt found at scene of crime and submit to inspection by jury, was not improper as tending to humiliate, degrade, or prejudice him, and did not violate constitutional privilege against being witness against himself.

11. WITNESSES—QUESTION ON CROSS-EXAMINATION IN PROSECUTION FOR HOMICIDE HELD PROPERLY EXCLUDED.

On cross-examination in prosecution for homicide, objection to the question, "Did any other person ever come to your door before this time?" was properly sustained because unlimited as to time, and court was empowered to keep such examination within proper limits.

12. CRIMINAL LAW—INSTRUCTING JURY TO DRAW OWN CONCLUSION FROM INSPECTION OF SHIRT RENDERED HARMLESS ANY ERROR IN OTHER EVIDENCE.

Any error in allowing sheriff to testify that shirt found at scene of homicide fitted defendant, and that hole in sleeve corresponded to scars on defendant's arm, was rendered harmless when jurors saw shirt on defendant and were instructed to draw their own conclusions.

See (1, 2, 4, 5, 6, 10, 12) 16 C. J. sec. 1100, p. 568, n. 15; sec. 1104, p. 569, n. 48 (new) ; sec. 1227, p. 620, n. 54, 55, 56; sec. 1588, p. 777, n. 86; sec. 2281, p. 924, n. 36; sec. 2290, p. 929, n. 86; sec. 2291, p. 931, n. 98; 17 C. J. sec. 3662, p. 317, n. 10; sec. 3664, p. 321, n. 47; sec. 3732, p. 362, n. 94; (3, 8, 9) 30 C. J. sec. 540, p. 296, n. 19; sec. 641, p. 397, n. 29, 30; sec. 722, p. 452, n. 38, 40; (7) 31 C. J. sec. 484, p. 855, n. 53; sec. 493, p. 857, n. 86, 858, n. 93; (11) 40 Cyc. p. 2517, n. 74.

APPEAL from Second Judicial District Court, Washoe County; *George A. Bartlett,* Judge.

Carlos Oschoa was convicted of involuntary manslaughter, and he appeals. **Affirmed. Rehearing denied.**

*Frame & Raffetto,* for Appellant:

That shirt found in cabin was worn by appellant and discarded after killing was merely theoretical assumption of prosecution. Evidence showed impossibility of telling how rents in garment were caused. Rents and scars on appellant's arm did not correspond. There is no proof that deceased used knife in affray.

Only evidence connecting appellant with crime is that of three witnesses—Indians and Mexican—who saw him

hours before and after crime; of Hillhouse, that garment fitted and that rents in shirt and scars on appellant's arm corresponded; and that obtained by compelling appellant to put on shirt in presence of jury for their inspection. Alibi was sustained by six witnesses and appellant.

Court erred in sustaining objection to cross-examination of Indian Peggy Parrott, as to her certainty of identification of appellant; in admitting testimony of Hillhouse, which consisted of conclusions, it is providence of jury alone to draw; and in violating constitutional guarantee by compelling appellant to be witness against himself. Inspection of physical features is proper for identification, not to fasten crime on accused. State v. Ah Chuey, 14 Nev. 79.

No evidence was offered in mitigation of crime. Manslaughter was not issue in case. Instructions should be applicable to issues. Kirk v. Territory (Okl.),—— P. ——. Evidence showed deliberate killing. Appellant could not be guilty of crime of which he was convicted.

*M. A. Diskin*, Attorney-General; *L. D. Summerfield*, District Attorney, for the State.

Jury, being exclusive judge of evidence, may disbelieve unsatisfactory testimony. No alibi· was established. 16 C. J. 93.

Though objection was sustained to question unlimited as to time asked of Peggy Parrott, appellant received answer to similar one properly limited.

Witness may state known or observed facts, though answer involves element of inference. 22 C. J. 527. Jury made inspection also, and drew its own conclusions.

In homicide case where there is no eyewitness, jury is entitled to bring in any included verdict from second degree murder, down. First degree could not be established and was not asked for. 30 C. J. 142–149.

Constitutional guarantee against defendant being made witness against himself relates exclusively to communications and statements by him, not demonstration of physical facts. 16 C. J. 568; State v. Petty, 32 Nev. 384.

When jury could have returned greater, appellant cannot complain of lesser included verdict. Gibson v. Somers, 31 Nev. 531; 17 C. J. 362.

## OPINION

By the Court, DUCKER, J.:

Appellant was charged with murder and convicted of involuntary manslaughter. The appeal is from the judgment and from an order overruling appellant's motion for a new trial. The appellant was convicted on circumstantial evidence. It is claimed that the evidence is not sufficient to support the verdict. On the morning of December 29, 1924, at about 9 o'clock, one Nick Gaerdoges, a Greek, was found dead in his cabin on Monkey Island in Reno, Nevada. Death had been caused by a bullet wound in the head. There was also a bullet wound in the chest, and the body was considerably bruised and lacerated. The body, fully dressed, was found lying on the floor of the cabin. On the floor near the body were found three revolver shells, a pair of overalls, and two shirts. The lock on the door of the cabin was sprung, apparently from the outside. According to the testimony of one Jennings, a witness for the prosecution, who was living in a house situated about 25 or 30 feet from the cabin of the deceased, he was awakened from his sleep on the night of the 28th of December by a noise or scuffle in the latter place. The scuffle did not last but a second or more, and then he heard some one say, "Don't! Oh, don't! Don't!" The last exclamation was in a loud tone of voice; very loud, the witness said. The witness was unable to state what time of the night it was when he heard the scuffle and exclamations. Appellant's presence in Reno near the time of the killing was sworn to by three witnesses. According to testimony of Manuel Atyde, he saw appellant on the night of the killing in company with Gaerdoges. He saw them talking to each other on the sidewalk in front of the Reno Garage on Second Street in Reno, as he passed by, but was unable to say what

time it was. He exchanged greetings with them as he passed. He was acquainted with Nick Gaerdoges, and had seen appellant before about town.

Peggy Parrott testified as follows: She lived in Reno and knew the appellant. When her boy was sick in the hospital, appellant was there also and she came to know him in that way. She had seen him also on the streets of Reno a number of times before the killing. On the morning of December 29, 1924, appellant came to her house in Reno and knocked on the screen door. She opened the door and talked to appellant. He wanted a place to sleep. She told him she had no blankets for him. He said, "All right," and turned around and walked away. He was there two or three minutes and stood within two feet of her. He talked to her in English. Mary Skimmerhorn testified at the preliminary examination. Her presence at the trial could not be obtained, and after a proper showing in this regard her deposition taken at that examination was introduced in evidence. In substance her testimony is as follows: She lived in Reno and knew Nick Gaerdoges, called "Nick the Greek." She heard of his death and saw appellant the next morning in Chinatown in Reno at about 8 o'clock and talked with him. She had seen him and talked with him before. On this occasion he had a rag around his arm. She saw blood stains on his coat and pants. She asked him what was the matter with his arm, and he told her that Nick the Greek cut his arm. He also told her that he was going to get out of town.

The sheriff, who found one of the shirts in the cabin on the morning of the discovery of the homicide, testified in regard to it and to certain scars on the appellant's body as follows: After the appellant had been apprehended, he, the sheriff, had him put the shirt on. He said that it fitted him very well, and that there were two holes in the left sleeve of the shirt; that the scars on appellant's left arm and left shoulder were in range of these holes; that there was also a scar on appellant's chest.

At the request of the district attorney and over the

objection of counsel for appellant, the latter was required by the court to remove his coat and shirt and permit the jury to see the scars on his body. He was also required to put on the shirt in question and submit to a view by the jury. The shirt was introduced in evidence and handed to the jury for inspection.

Jose Salazar, a witness for appellant, testified substantially as follows: He lived in Westwood, Calif., and had known appellant for nine years. They were brothers-in-law. Appellant came to his house in Westwood on November 11, 1924, and lived there until he was arrested and brought to Reno on the present charge. He slept at the home of the witness every night from Christmas during December and January. They slept in the same bed. The marks on appellant's body were there when he came to Westwood on November 11. He had two marks on his body when he came to Westwood after leaving the hospital. The other marks had been on his body for a long time. The scar on the left arm had been there for nine years. In rebuttal of this testimony concerning the scars on the left arm, the state placed Charles R. Hillhouse on the stand. He testified as follows: He was clerk of the identification bureau of the city of Reno police department. His duties consisted of photographing finger prints and taking a description of all prisoners. On November 10, 1924, he examined appellant's arms and face for scars and distinguishing marks. The appellant was required by the court to exhibit his left arm to the witness, and his attention was called to a scar about an inch in length on the outer side of the left arm. The witness testified that the scar was not there when he made the former examination.

The appellant interposed the defense of an alibi. He was a witness in his own behalf. He testified in substance that after being ordered out of town by the chief of police he left Reno, going to Westwood, Calif., and was at the latter place when the homicide was committed.

1. Six other witnesses also testified in support of this alibi. Aside from the appellant, the testimony of

only one of these witnesses, that of his brother-in-law, Jose Salazar, if true, made it impossible for the appellant to have committed the offense. It appears from the evidence that it is about a four hours' drive by automobile between the two places. The appellant could have killed the deceased and have been seen in Westwood at the times as related by the witnesses. In other words, their testimony, if true, did not establish a complete alibi. An alibi is not complete unless it reasonably appears therefrom that the defendant could not have been at the place where the crime was committed. On cross-examination two of these witnesses admitted having told the sheriff that it was on a date other than the 28th or 29th of September that they saw the appellant in Westwood. Another of these witnesses on cross-examination claimed to have seen appellant in Westwood at times when he was admittedly in Reno. The weight of the evidence in support of the defense of alibi was, of course, for the jury, whose verdict shows that it was not established to its satisfaction.

As said in Bast v. Commonwealth, 124 Ky. 747, 99 S. W. 978:

"An alibi is the strongest possible defense when thoroughly established, but it becomes, at once, the most dangerous and weakest of all defenses that could be set up, when it is not thoroughly established."

2. The evidence on the part of the prosecution showed that appellant was in Reno on the night of the killing. He was abroad in the early morning hours looking for a place to sleep, as testified to by the Indian woman, Peggy Parrott. He was last seen that night in company with the man who was killed. The most damaging testimony against him was that given by the Indian woman, Mary Skimmerhorn, who talked with him the next morning, and whom he told that Nick the Greek had cut his arm and that he intended to get out of town. True, there are statements in this testimony, brought out on cross-examination, such as: "He didn't say nothing to me." "He didn't tell me anything," which counsel for appellant detach from the whole testimony

and argue that they render it unworthy of belief. The testimony ought not to be considered in this way. The witness was evidently an illiterate Indian woman whose ability to express herself clearly in English was extremely limited. Statements apparently contradictory seemed to be characteristic of her speech. For instance, she said: "I didn't say nothing. I say, 'What's the matter with your arm?' I say that to him." Another answer was as follows: "I didn't say nothing. I go away, and I never spoke good to him. I ask a little bit." And again: "He didn't say nothing, only, 'I'm going to get out of town.'" These were merely peculiarities of expression and were not sufficient alone to warrant the jury in disregarding her testimony. If the jury believed her testimony, it connected the appellant directly with the commission of the crime. Appellant's attempt to account for the scar on his left arm by the testimony of his brother-in-law, which was rebutted by the state, was, if the jury believed the latter testimony, a circumstance against him.

3-6. It is difficult to tell what, if any, inferences the jury may have drawn from the inspection of the shirt with reference to the appellant's body; but aside from this, the other evidence was sufficient to justify the jury in concluding the appellant killed the deceased. There were blood stains on the shirt and rents in it, one of which in the left shoulder appeared to have been made with a knife or sharp instrument. The evidence points to a desperate struggle between the deceased and his slayer. The Indian, Mary Skimmerhorn, testified that appellant told her Nick the Greek cut his arm. The shirt was found at the scene of the killing, evidently discarded by the slayer. Under these circumstances, if the rent in the shirt made by the knife corresponded with a scar on the appellant's arm, the shirt was material as tending, however slight may have been the tendency, to identify the accused with the person who committed the crime. Its weight was for the jury. On the other hand, if there was no correspondence in this regard, the shirt was immaterial and its admission in

evidence was error. But certainly in this event it was harmless error, for the condition of the shirt would support an inference that it was worn by some one else during the struggle.

7. It is contended that the verdict of involuntary manslaughter is inconsistent with the facts, and as there is no evidence tending to show involuntary manslaughter, this grade of felonious homicide was not in the case and therefore cannot stand. In conformity with the common-law rule and the great weight of authority, this court has held that one indicted for murder may be found guilty of involuntary manslaughter. In Re Somers, 31 Nev. 531, 103 P. 1073, 24 L. R. A. (N. S.) 504, 135 Am. St. Rep. 700. Section 369 of the criminal practice act (Rev. Laws, sec. 7219), as amended by Statutes of 1919, at page 430, sec. 65, precludes any other view. It reads:

"In all cases the defendant may be found guilty of any offense, the commission of which is necessarily included in that with which he is charged, or may be found guilty of an attempt to commit the offense charged."

Manslaughter, whether intentional or unintentional, is necessarily included in a charge of murder. The application of the rule of the statute is not affected by the fact that the crime under the law and facts ought to be fixed at a higher grade or degree. 13 R. C. L. 757; State v. Lindsey, 19 Nev. 47, 5 P. 822, 3 Am. St. Rep. 776. In State v. Lindsey the appellant was indicted for the crime of murder, alleged to have been committed by administering poison. The jury found her guilty of murder of the second degree. The judgment was affirmed. Murder by means of poison is, under the statute, murder of the first degree. The court said:

"But suppose the jury, in charity for the faults and weakness of the human race, sympathy for the prisoner, or any other mistaken view of the law or the facts, lessens the offense to murder in the second degree, is the prisoner to go free? Does not the case stand precisely upon the same plane as a verdict of murder in the second degree in any case not enumerated in the statute, where there is a willful, deliberate, and premeditated

killing? Is it not as much the duty of the jury in such a case to find the prisoner guilty of murder in the first degree as in the cases specially enumerated in the statute? Suppose the jury in such a case, where the evidence is positive, clear, plain, and satisfactory beyond a reasonable doubt, regardless of all the testimony, and in violation of the well-settled principles of law, should find the prisoner guilty of murder in the second degree, would the prisoner be entitled to a new trial upon the ground that the verdict is against the evidence? Is it not a fact that juries frequently render just such verdicts, and the result cannot be accounted for upon any theory other than that of a compromise of opinion? Why should such verdicts be allowed to stand? * * * The reason is, that the statute leaves the question of degree to be settled by the verdict of the jury."

It may be said with equal reason that the statute quoted above also leaves it to the jury to find any grade of homicide embraced within the crime charged.

In Indiana, the statutes empowering the jury to fix the degree of a crime and to convict of any offense, the commission of which is necessarily included in the crime charged, are similar to ours, and murder by means of poison is murder of the first degree. In Hasenfuss v. State, 156 Ind. 246, 59 N. E. 463, the defendant was charged with murder of the first degree by administering poison, and convicted of voluntary manslaughter. The judgment was affirmed, the court holding that it was without power to disturb the verdict. Referring to that case, the court in Gipe v. State, 165 Ind. 433, 75 N.E. 881, 1 L. R. A. (N. S.) 419, 112 Am. St. Rep. 238, said:

"It must not be forgotten that a charge of murder in the first degree comprehends every grade of felonious homicide, and that a finding of involuntary manslaughter cannot be disturbed on appeal because the evidence shows that the defendant was guilty of murder."

It was held in Commonwealth v. McPike, 3 Cush. (Mass.) 181, 50 Am. Dec. 727, that one convicted of manslaughter has no reasonable ground of complaint when the evidence proves murder. In Moore v. People, 26 Colo. 213, 57 P. 857, the court said:

"On the other hand, if they were satisfied that he [defendant] sought the combat with a felonious intent, they might have found him guilty of murder; in which event, he could not be heard to say that a conviction for manslaughter is erroneous"—citing State v. Lindsey, 19 Nev. 47, 5 P. 822, 3 Am. St. Rep. 776.

Mr. Wharton, in his work on criminal law (volume 2, sec. 932), says:

"It is no defense to an indictment for manslaughter, that the homicide therein alleged appears by the evidence to have been committed with malice aforethought, and was, therefore, murder; but the defendant, in such case, may notwithstanding be properly convicted of the offense of manslaughter."

Where the indictment charges a higher degree of felonious homicide and the verdict is for a lesser degree or grade included within the higher, the general rule is thus stated in 13 R. C. L. pp. 757, 758:

"It is deemed to be wholly within the province of the jury to fix the punishment; and even though the evidence may fully disclose that the defendant was guilty of a higher degree than that found against him, still the verdict cannot be disturbed for that reason. The courts recognize that it is not an uncommon thing for a jury, out of sympathy, or what they conceive to be extenuating circumstances, to find the defendant guilty of a lower degree or grade of offense than that of which the evidence clearly convicts him; but the fact that they do so is not a ground of reversal of the verdict and judgment."

The following statement of the rule is found in 17 C. J. p. 362:

"Defendant cannot complain of error in finding him guilty of a lower degree of crime than the one shown by the evidence."

See cases cited in note 94.

8. Appellant, in the opening brief, concedes that the undisputed evidence clearly establishes a voluntary killing under circumstances amounting at least to murder in the second degree, and concedes that if the attending

circumstances be considered at all, they were in aggravation of the offense rather than in mitigation. If this concession is admitted, then, under the rule stated, the appellant cannot be heard to complain because the jury by its verdict extended to him the grace of lesser punishment than the facts warranted.

9. But the verdict of involuntary manslaughter was not improper in this case for another reason. There were no eyewitnesses to the killing. Presumptively, every killing is murder, and while the physical facts in this case indicate a voluntary killing, yet involuntary manslaughter, or even justifiable homicide, were not outside the range of possibility. The circumstances do not preclude murder, nor do they exclude any other lower grade of the offense. Under such circumstances it was proper for the court to instruct as to all grades of the offense, and it was for the jury to infer from all the circumstances the degree of guilt. 30 C. J. 397. The general rule in such cases is thus stated in the authority last cited as follows:

"Where there were no eyewitnesses to the killing and the evidence is purely circumstantial, the court should instruct the jury as to the different grades of homicide, * * * unless it is evident from the whole proof that defendant is either guilty of murder, or innocent."

The facts of this case do not bring it within the exception above stated, for, notwithstanding appellant concedes a case of murder, the evidence does not show it to be such. While the fact that deceased was shot twice, once in the body and once in the head, indicating a voluntary killing which could have been either murder, voluntary manslaughter, or a justifiable homicide, still it could have been an unintentional killing in the course of an assault with a deadly weapon. As previously stated, evidence discloses that there was a hard struggle between the deceased and his slayer. Under such circumstances it was not for the court to say that an unintentional killing was precluded by the facts.

In Hasenfuss v. State, supra, in which the indictment charged murder by administering poison, and the verdict

for voluntary manslaughter was found by the jury and upheld by the court, the court said that it was difficult to conjecture a case where the crime of manslaughter can be said to be committed by means of administering poison, but that the jury discovered such a case, notwithstanding the assertion of counsel that none under any circumstances could be imagined.

The defendant in the case of State v. Crockett, 39 Or. 76, 65 P. 447, cited in respondent's brief, was indicted for murder in the first, and convicted of murder in the second, degree for killing her husband. Proof of the manner and circumstances of the killing, and the defendant's connection therewith, was entirely circumstantial. The court in the course of its opinion affirming the judgment said:

"The deceased was shot while in bed, some time during the night. At the time the only persons in the house were the defendant, the deceased, and their three small children, the latter of whom were asleep. The defendant denied any participation in the killing, and claimed that it was a case of suicide. The question, therefore, as to when and by whom the killing was done—whether by the deceased himself or by the defendant, and, if by the defendant, whether purposely and of deliberate and premeditated malice, or purposely and maliciously, but without deliberation and premeditation, or in a sudden heat of passion—was a mere matter of inference from the testimony; and therefore the degree of the defendant's guilt, if guilty at all, was for the jury to determine from the entire circumstances of the case, and not the court."

See, also, Stanley and Nix v. Commonwealth, 184 Ky. 237, 211 S. W. 577.

10. Error is assigned as to the action of the court in requiring appellant to remove his coat and shirt and permit the jury to see the scars on his body; and to don the shirt introduced in evidence, and submit to an inspection by the jury. It is contended that his constitutional privilege from being a witness against himself in a criminal case was violated by this proceeding.

The contention has been resolved against appellant by a former decision of this court in the case of State v. Ah Cheuy, 14 Nev. 79, 33 Am. Rep. 530, in which case the trial court compelled defendant, against his objection, to exhibit his arm so as to show certain tatoo marks thereon to the jury. With that decision we are in entire accord. We are satisfied that the constitutional provision invoked by appellant relates solely to testimonial compulsion. Holt v. United States, 218 U. S. 245, 31 S. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138; State v. Barela et al., 23 N. M. 395, 168 P. 545, L. R. A. 1918B, 844; Wigmore on Evidence, vol. 4, secs. 2263 and 2265.

As in the case of State v. Ah Cheuy, there was nothing in the proceeding complained of in this case which tended to humiliate or degrade appellant or otherwise prejudice him before the jury.

11. The court sustained an objection to the following question asked on cross-examination of Peggy Parrott: "Q. Did any other person ever come to your door before this time?" There was no limit as to time in this question. While a wide latitude of cross-examination should be allowed in a criminal case, the court is empowered to keep such examination within proper limits. Counsel reframed the question in the following manner: "Q. Did any Mexican other than this man come to your house about that time?" The witness was permitted to answer. There was no error in the ruling complained of.

The ruling of the court in permitting the sheriff to testify that the shirt found in the cabin of the deceased on the morning of the discovery of the body fitted the appellant, and that the cut and hole in the left sleeve corresponded with scars on defendant's body, is assigned as error. If it were error to allow the witness to state these conclusions, it was rendered harmless by the fact that the jurors were permitted to see the shirt on the appellant's body and instructed to draw their own conclusions. In this regard, at appellant's request, the jury was correctly instructed as follows:

"The court instructs the jury that it is the law that

when a witness has testified to certain physical facts based upon his inspection of the same, and the jurors have had an equal opportunity of inspecting the same physical facts, it is the duty of the jurors to draw their own conclusions from their own inspection of such physical facts."

There being no prejudicial error in the record, the judgment is affirmed.

May 11, 1926.

*Per Curiam:*

Rehearing denied.