## Lambdin v. Commonwealth.

(Decided Sept. 25, 1934.)

R. S. ROSE, H. H. TYE, J. B. JOHNSON and T. E. MAHAN for appellant.

BAILEY P. WOOTTON, Attorney General, and H. HAMILTON RICE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER—Affirming.

Jim and Joe Lambdin have been jointly indicted by the grand jury of Whitley county for the murder of Jim Rose. The indictment charged each with the commission of the offense, in separate counts charged each with aiding and abetting the other therein, and in an-

other count charged that the killing was done pursuant to a conspiracy entered into between defendants.

On separate trial Jim Lambdin has been convicted of the crime charged in the indictment and his punishment fixed at confinement in the penitentiary for life. He is appealing, and the principal ground relied on for reversal is that the instructions given by the court were erroneous and prejudicial.

The facts in evidence are that on June 13, 1933, while walking along a public road with his six year old son, Ed, Jim Rose was shot by some one in concealment in back of him. The bullet, entering the back of his head, caused instant death. His little son, who was permitted to testify without objection, stated that he heard the shot and saw his father fall; but there is no evidence to indicate that he saw the assailant. Rose had spent the previous night at the home of his mother and was on the way to his own home. The road he was traveling passed the home of George Lambdin, father of Jim and Joe. Joe Lambdin was married and lived in a house a short distance from the home of his father and, as we gather from the evidence, some little distance from the road. When Jim Rose was shot, his son began crying and screaming and ran back toward the home of his grandmother. She and her daughter heard him and started running to meet him. When they met him, he told them what had occurred and they proceeded on toward the scene of the tragedy and in so doing passed the home of George Lambdin and saw him and some other members of his family on the porch. They both testified that after passing George Lambdin's home and before they arrived at the scene of the killing, they saw Jim and Joe Lambdin running across the road ahead of them and that each of the Lambdins had a long gun. Simon Lambdin testified that he was at work in a field about 150 yards from where Jim Rose was killed; that the shot, followed by the screams of the child, attracted his attention and he saw Joe Lambdin running away from the scene. At the time he first saw Joe Lambdin he was about 15 or 20 steps from where Rose fell and was running toward the home of his father, carrying a long gun. There is some evidence that there was bad feeling between Jim and Joe Lambdin and Rose growing out of accusations that the latter had burned a barn of the Lambdins. There is evidence that at various times shortly before and immediately after the

killing, Jim and Joe Lambdin were seen together with rifles; that one of them had a Winchester and the other, what is called in evidence, a high-powered rifle. A number of witnesses testified to having observed tracks and signs of others near where Rose was shot, and there is evidence indicating that a person had concealed himself behind a large tree at the side of the road near the highway. This was evidenced by fresh mud on the leaves and by tracks. Some of them testified that these tracks at and near where the party had hidden behind the tree indicated that two persons were present and that they followed the tracks leading away from this point for some distance.

Joe and Jim Lambdin testified that the night before the killing they stayed at the home of their father, but early the next morning left and went to Joe's home, where they remained until noon. This, they testified, was about three-quarters of a mile from where Rose was killed. They testified that they did not shoot Jim Rose and were not near the place where he was killed that morning. They were corroborated in their evidence as to their whereabouts on the morning of the killing by a number of witnesses.

Instruction No. 1 is criticized as erroneous because it contained instructions both as to murder and manslaughter and because the words "willfully, feloniously, etc.," do not carry through the murder instruction over to the voluntary manslaughter instruction, and some authorities are cited in support of this contention, prominent among which are Strange v. Commonwealth, 254 Ky. 57, 70 S. W. (2d) 972. A reading of that case will disclose that an instruction submitting both the theory of murder and manslaughter was not condemned or held to be erroneous, the opinion merely indicating that the better practice is to submit these different degrees of the crime in separate instructions. The judgment of the lower court was reversed because of other error in the instructions, and not because instructions on murder and manslaughter were included in one instruction.

The criticized instruction, in effect, authorized the jury to find appellant guilty of murder if they believed from the evidence beyond a reasonable doubt, that he willfully, feloniously, etc., shot and killed Jim Rose if the shooting was done with malice aforethought, but

guilty of voluntary manslaughter if the shooting was done without malice aforethought and in sudden affray, etc. So it will be seen that the words "if you believe from the evidence beyond a reasonable doubt" and "willfully, feloniously, etc.," did carry through to the manslaughter instruction.

Instruction No. 1 is further criticized because it leaves out the words "apparent self-defense," but this will be disposed of in connection with the contention that the self-defense instruction is erroneous.

It is urged that instruction No. 2 is involved and confusing because of repetition and amounts to a peremptory instruction to find accused guilty of murder. This instruction on aiding and abetting, like the first instruction, includes instructions on both murder and manslaughter. While the instruction is rather inaptly worded and awkwardly drawn and, as pointed out by counsel, some of the words are misspelled, it does not contain the vice attributed to it by counsel and is not so confusing as to mislead a jury of intelligent men.

Finally, it is urged that instruction No. 3 on self-defense is erroneous, in that it required appellant to believe that both he and his brother were in danger before he could act in self-defense or in defense of his brother, or, in other words, that the conjunction "and" was used instead of "or." It is true that self-defense instructions in this form have been condemned; however, in this case the evidence shows that deceased was a man afflicted with tuberculosis of the bone, terribly drawn and bent over, and practically helpless from this disease, that at the time he was shot he was unarmed, and there is no evidence whatever of a struggle. There was one eyewitness to the shooting, and his evidence as well as other evidence indicates that this was a treacherous, cold-blooded assassination, and the only real question involved is that of the identity of the assassin or assassins. Appellant claims that neither he nor his brother fired the shot. If there had been no eyewitness to the killing and there had been evidence of a struggle, then it would have been the duty of the court to have given an instruction on self-defense. Messer v. Commonwealth, 90 S. W. 955, 28 Ky. Law Rep. 920; Elliot v. Commonwealth, 152 Ky. 791, 154 S. W. 25; Bast v. Commonwealth, 124 Ky. 747, 99 S. W. 978, 30 Ky. Law Rep. 967.

In the proven circumstances, appellant was not entitled to an instruction on self-defense and the only issue was whether he did the killing or aided and abetted his brother in so doing; therefore, he was not prejudiced by any error in the form of the self-defense instruction or in any reference to self-defense in the other instructions.

Since there is ample evidence to support the verdict of the jury and no error is found in the record prejudicial to appellant's substantial rights, the judgment is affirmed.