## Bond v. Commonwealth.

(Decided Jan. 18, 1935.)

WAUGH & HOWERTON for appellant.

BAILEY P. WOOTTON, Attorney General, and RAY L. MUR-
PHY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Affirming.

The appellant, Henry Bond, when tried under an
indictment returned by the Boyd county grand jury
charging him with the crime of murder, was convicted
of manslaughter and sentenced to a term of four years
in the state penitentiary. On appeal, he urges two
grounds for reversal of the judgment: (1) That the
verdict is not sustained by the evidence, and (2) that
the instructions are erroneous.

For the proper consideration of the merit of objec-
tion 1, it is needful to briefly summarize the evidence
heard upon the trial.

Without stopping to detail the events which cul-
minated in the killing of Bernard Friley, it is sufficient
to say that both men had been drinking during the day
and evening on which this charged crime was shown
to have been committed; that on this day the deceased,
Friley, went to the home of Sam Smith, situated a short
distance off of Halbert avenue in Ashland, Ky.; that
the deceased was found about 8:30 that evening lying
in a ditch on Halbert avenue, unconscious and faintly
struggling, his skull crushed, and brains oozing there-
from; and that he died within a few minutes after
being found.

The evidence shows that the deceased had spent practically the whole day at the home of Sam Smith, near where he was found, in drinking and carousing; also, that the accused had been drinking during the day and had been at the Smith home from about 2 until 4 or 5 o'clock; and that he returned to the Smith home about 7 o'clock that evening, when he was met at the door by Mrs. Smith, who requested him to take Friley away, as he was then drunk, boisterous and abusive.

It is admitted that the accused, Fred (or ''Candy'') Bond, and Bernard (or ''Brillo'') Friley had been close and intimate friends for a number of years; that Bond, on many previous occasions, when Friley had gotten into trouble during his drinking sprees, had always helped him and cared for him; and that, even up to the time of his taking Friley away from the Smith home—just prior to Friley's being killed—the relationship between them seemed most intimate and friendly. The evidence further shows that Bond, when asked upon this occasion to take his friend Friley away, went in and said to Friley, ''Brillo, let's leave here,'' to which Friley answered, ''All right, Candy''; and that he put his arms around him and got him out on the road, and, so helping him, that they went away together in the direction of his home, towards Forty-Fifth street (upon which they both lived), up to the top of Ferguson Hill, from where they could see Friley's house; that Friley seeming to be then somewhat sobered, he left him to go alone to his home, while Bond turned and went in the opposite direction up Forty-Fifth street towards his own home; and that he stopped along the way, at the home of some friends, the Williamses, for about a half hour, when he left at about 7:30, as to which he is corroborated by the testimony of these friends whom he visited, and went on home, where he and his wife had supper; after which they went over to see his kinspeople, the Barkers (between 8 and 8:30), where they stayed until after 10 o'clock, when they again went home. The accused is corroborated in his evidence as to the time and length of his and his wife's visit to the Barkers by the testimony of several members of that family.

Bond was arrested at this home at about 11 o'clock, carried to police headquarters, and left with the chief of police while the arresting officers returned to his home

to search for evidence connecting him with Friley's death.

They testify that they there found some fresh blood stains upon a linoleum rug, and it is also testified by the chief of police that he detected fresh blood stains upon the accused's shoes when he was turned over to him when arrested.

Further, it is shown, and admitted by the accused, that when testifying upon an examining trial, which was held shortly after his arrest, he denied that he had been at the home of Sam Smith (a "speakeasy") more than one time on the day of Friley's killing when he visited it during that afternoon. He also denied that he had seen or been with the deceased at any time that day after he left him at Smith's home during the afternoon about 4 o'clock. He explains these denials by saying that he was at the time of his examining trial excited and didn't know what to say. Further he admitted that although he was telephoned during the evening Friley was killed, as to his having been found with his head crushed and dying on Halbert street, he yet did not go near his friend's home that night, after so recently taking him home.

Further, Mrs. Smith testifies that she requested the accused to take Friley away from her house on the occasion in evidence and that she last saw them going together towards Halbert street in the direction of Friley's home, which was near the spot where Friley was shortly thereafter found in a dying condition in the ditch on Halbert street.

There is also evidence given by several parties that during the afternoon of this day upon which this tragedy occurred, when Bond and Friley and they were all drinking together at the Smith home, or "joint," Bond asked several of those present if they had heard of Friley's lately having had him indicted. They stated, however, that he did not manifest any ill feeling or resentment towards Friley because of it.

The accused in his testimony seeks to account for the blood spots upon his shoes and the stains (described as blood) upon the linoleum, by stating that the latter spots were red paint and that the blood found on his shoes, as testified to by the chief of police, was the blood of hogs, which he had lately gotten on them while helping a friend kill and hang his hogs. He also stated

that frequently his nose would bleed, though he did not attribute the presence of the blood stains in evidence to this. On the other hand, it is testified by a witness for the commonwealth, an expert chemist employed at the public service laboratory at the University of Kentucky, that he had made an examination of the blood on the accused's shoes and found that it was human blood, tending to rebut the accused's claim that it was the blood of hogs.

Further, it was testified for the commonwealth by a McPeek boy that, as he was going up Halbert avenue on the evening in evidence, he heard a noise, like struggling, near by the road, when he looked and saw the body of a man lying in the ditch; that he called to Mr. Ferguson living close by, who at once, together with Mr. Gillum, came out, and went back with him where they found the body, which they identified as that of the deceased, Bernard Friley; and that he was then alive and still slightly struggling, but was dying, and soon died from the effects of a crushing blow he had received on his head. The body was found in the ditch along Halbert avenue only about 200 feet from the home of the accused.

Further, it was testified by the coroner, from his examination made of the body, that the deceased met his death by a blow made with a blunt instrument, like a hammer, which crushed in his skull, and also that due to his discovery of scratched places upon decedent's knees and from the location and nature of the skull wound, it was his judgment the blow had been inflicted from behind, when the decedent had fallen to his knees.

Upon this evidence, the defendant contends that he was entitled to a peremptory instruction, as it was all circumstantial evidence and equally, if not more consistent, he argues, with his innocence than with his guilt.

We are of the opinion that this contention is not meritorious, in that it is a well-settled rule that, it being the province of the jury to determine the weight and credibility of the witnesses, where any evidence is given of substance and probative value—even though slight or circumstantial—conducing to show the defendant's guilty connection with the crime, the guilt or innocence of the defendant is for the jury to determine. Lacey v. Commonwealth, 251 Ky. 419, 65 S. W. (2d) 61; Bullock v. Commonwealth, 249 Ky. 1, 60 S. W. (2d) 108,

94 A. L. R. 407. It is to be conceded that the evidence here introduced was entirely circumstantial, but such evidence is entitled to be measured by the same standards and its weight determined by the same methods applicable to other kinds of testimony, and it is often equally convincing and entitled to equal weight.

It is further to be said, in answer to the appellant's second objection that the court erred in here giving a manslaughter instruction, that—the evidence being here circumstantial and there being no eyewitnesses to the commission of the crime—it was the duty of the court, as in such case it has by this court repeatedly been held proper, to give instructions covering the whole law of the case covering all the evidence and every theory both of the defendant and the prosecution supported thereby. Here there was some evidence that the deceased had met his death after a struggle, which justified the giving of the manslaughter instruction.

In the case of Elliott v. Commonwealth, 152 Ky. 791, 154 S. W. 25, 27, this court said:

"In the case of Rutherford v. Commonwealth, 13 Bush, 608, the rule is laid down that, where no eyewitness is introduced, the court should give in the instructions the law applicable to murder, manslaughter, and self-defense, so that the jury might find from all the circumstances in evidence the state of fact that existed; and that rule has been uniformly followed since in this court, and has only been modified * * * to the extent that, where the physical facts are such as to preclude the idea that there was a struggle or any resistance offered by the deceased at the time his life was taken, the trial court would be justified in refusing to give an instruction on self-defense."

In Bast v. Commonwealth, 124 Ky. 760, 99 S. W. 978, 30 Ky. Law Rep. 967, a full review of the Kentucky cases on this subject can be found.

We are constrained to the view that under the evidence heard in this case, it was proper for the court to instruct the jury upon the whole law of the case, and therefore that the instruction upon manslaughter was in harmony with the general rule as announced supra. Again in Fletcher v. Commonwealth, 239 Ky. 506, 39 S. W. (2d) 972, 977, where the evidence was of

a circumstantial nature but some of it indicating that a struggle had taken place when the deceased was killed, the court said:

> "The court has many times held that when there is no eyewitness to a homicide and the evidence is purely circumstantial, especially where the surrounding conditions indicate that there was a struggle at the time of its commission, it is the duty of the trial court, out of due regard for human life and liberty, to instruct upon every phase or degree of the offense that might possibly be applicable in order that the jury may return a verdict under any state of fact it might infer from the circumstances to have existed. This includes an instruction on self-defense and manslaughter. Roberson's Criminal Law, sec. 1872; Brown v. Commonwealth, 117 Ky. 767, 78 S. W. 1126, 25 Ky. Law Rep. 1896; Rutherford v. Commonwealth, 13 Bush, 608."

For the reasons hereinabove indicated, we conclude that the contentions argued by appellant for a reversal of the judgment are not in accord with the well-established rules and principles hereinabove announced, and for such reason are not to be sustained.

The judgment is affirmed.