## Quinn v. Commonwealth.

(Decided June 4, 1935.)

J. B. CAMPBELL for appellant.

BAILEY P. WOOTTON, Attorney General, and RAY L. MURPHY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

The appellant was jointly indicted with Lindsay Taylor, Albert Taylor, and James Hawn, for the murder of Orlin Miller. The Taylors and Hawn were tried and acquitted previous to the trial of appellant, who was tried at the June, 1934, term of the Knox circuit court, convicted of manslaughter, and sentenced to 15 years in the penitentiary. He appeals.

Appellant admits that he killed the deceased and pleads self-defense. The grounds urged for a reversal are that (1) the commonwealth failed to produce proof sufficient to show guilt, and appellant's motion for a peremptory instruction should have been sustained, and (2) if the evidence was sufficient to warrant a submission to the jury, the verdict is flagrantly against the weight of the evidence.

According to the evidence of appellant and his witnesses, the facts, in substance, are these:

On the morning of September 19, 1933, the day the killing occurred, appellant and his companions, the two Taylors and Hawn, were in Barbourville, and appellant sold to Hawn a Ford car for a pistol and a few dollars

in money. Hawn conceived the idea that he might sell the car to Becham Mills who lived on Stinking creek, several miles from Barbourville. Hawn, the two Taylors, and appellant then started to Becham Mills' home and near the suburbs of Barbourville, while passing deceased's place of business or home, deceased signaled them and they stopped and deceased told them that he would go to Stinking creek with them. After they left the main highway, No. 25, and while going up Stinking creek, Miller, the deceased, made it known that he had some whisky with him, and produced a pint bottle of whisky, of which they all took a drink. After they reached Becham Mills' place Hawn and Mills began discussing the trade about the car. About that time the deceased exhibited a pistol and became boisterous and asked if he could get any whisky. Mills then asked Hawn to take the deceased away and come back some other time. They started back down Stinking creek and in the meantime procured another quart of whisky, of which they all drank freely. They then emptied the remainder of the whisky into another bottle which was in the car, and the deceased took charge of it. They proceeded on down the creek toward the main highway, and just before reaching the highway they decided to drive off the main road and take another drink. They parked the car in the edge of a field in a rather secluded place. It was suggested by some one that they take another drink, and appellant picked up a bottle of whisky which deceased had with him when he started on the trip. It appears that the deceased did not want them to drink his whisky, stating that he wanted to keep it for a purpose on that night. The deceased became enraged because appellant picked up his whisky and cursed appellant, slapped him on the face and kicked him on the leg, and then ran his right hand under his shirt in an effort to get his pistol, and appellant grabbed him with his left hand and at the same time struck the deceased over the left eye with a bottle which he, appellant, held in his right hand. Deceased continued in his efforts to get his pistol, and appellant struck deceased twice more with the bottle and cut a place on the side of the neck. Then the deceased broke loose from appellant, jumped back a few steps and said, "Now, G—— d—— you, I will fix you," and jerked his pistol and fired at appellant, but missed him, and the bullet took effect in the back of the front seat of the automobile, and in the

meantime appellant got his pistol and shot the deceased, from which he died almost instantly. The witnesses say the two shots were fired almost simultaneously, but if any difference, the deceased fired first. Then they all left the place of the killing and appellant surrendered himself to a justice of the peace, who, with others, accompanied him to the Knox county jail, and delivered him to the jailer.

The evidence introduced for the commonwealth conduces to show, in substance, the following state of facts: to take it on himself and they would help him swear out. However, this statement was contradicted by W. H. Davis, the jail turnkey, who said he was present at the time, and that appellant made no such statement. Allen Barker testified that he lived about one-half mile from the place the deceased was killed, and that he heard only one shot fired. W. C. Hopper, the undertaker who handled the body of deceased, testified that there were two cuts on the left side of the throat, one shallow, and the other deep. He said it appeared that the wounds had been inflicted with some sharp instrument. Dr. Jones, who examined the body of the deceased, testified that the wound in the neck had been inflicted with some very sharp instrument. It does not ap-

W. M. Lawson testified that he did not see any part of the trouble but heard one or two shots fired, but was not sure just how many, but if he heard two, they were fired pretty closely together and were about the same volume or one a little larger or louder. Fred Gray, a boy who was about 10 years old at that time, testified that he was about a quarter of a mile from the scene of the killing and saw two men wrestling, as he thought, and then heard one shot fired. However, he says that they were wrestling 15 or 20 minutes before he heard the shot.

Slusher Gray, a brother of the witness Fred Gray, who was with Fred at the time, testified to about the same state of facts as were testified to by Fred. John Miller, who accompanied the magistrate and appellant to the jail in Barbourville, testified that appellant said he killed Miller, but that he had it to do, and further stated in conversation at the jail, appellant said "Red" (one of his Taylor companions) killed him. Another witness testified that appellant said that the Taylor boy was in the killing as deep as he was, but they told him

pear from the doctor's testimony that deceased's throat was cut, but that the wound was only a flesh wound, and that deceased's death was the result of the shot.

It is insisted for the commonwealth that the cuts on deceased's neck could not have been inflicted by striking him with a bottle, and that these wounds were inflicted with a knife or some other sharp instrument at the hands of appellant or some of his witness companions. However, there is no evidence to sustain this theory except that it may be inferred from the evidence of the doctor and undertaker and the circumstances. It also appears that appellant's three witnesses who were indicted with him for the same offense were his close friends. It is further shown that appellant made conflicting statements with respect to the killing of deceased. He stated that he did it but had it to do, and, according to the testimony of one witness, he also stated that "Red" killed the deceased and that he took it on himself under their promise that they would help swear him out, and also stated that "Red" was as deep in the killing as he was. Four witnesses who were a distance away testified to the number of shots they heard fired, three of whom testifying that there was only one shot fired, while the fourth one was not certain whether he heard one or two shots. It will thus be seen that the preponderance of the evidence is to the effect that there was only one shot fired. There is evidence to the effect that a bullet was taken from the rear of the front seat of the automobile which appellant and his witnesses claim was fired at appellant by deceased. There is some intimation in the record that, if there were two shots fired, the second one was fired into the automobile by appellant or some of his companion witnesses for the purpose of using the fact as evidence. It must be conceded, however that to give full weight and credit to the testimony of appellant and his eyewitnesses, appellant should have been acquitted; but, the jury had the right to, and no doubt did, take into consideration all the attendant circumstances in weighing and determining the weight and credibility to be given the evidence of appellant and his witnesses. Conceding that the evidence for the commonwealth is not at all strong, but, when viewed in the light of all the attendant circumstances, it shows more than a mere suspicion and speculation, and was sufficient to go to the jury for its de-

termination. Bond v. Com., 257 Ky. 366, 78 S. W. (2d) 1; Roaden v. Com., 248 Ky. 154, 58 S. W. (2d) 364; McGahan v. Com., 257 Ky. 422, 78 S. W. (2d) 308.

In Burden v. Com., 216 Ky. 787, 288 S. W. 742, 743, it is said:

"We have constantly and repeatedly announced the rule to be that a judgment of conviction in a criminal prosecution could not be said to be so flagrantly against the evidence as to authorize the court to set it aside for that reason, unless at first blush it appeared to be the result of passion or prejudice on the part of the jury, or to have been founded upon no evidence of convincing or convicting force."

Measuring the proven facts and attendant circumstances of this case to the Burden Case, supra, and numerous other opinions of this court, we are unable to say that the verdict was the result of passion or prejudice on part of the jury. We think the evidence is sufficient to sustain the verdict.

Perceiving no error prejudicial to the substantial rights of appellant, the judgment is affirmed.