# Bass v. Commonwealth.

Jan. 21, 1944.

Hubert Meredith, Attorney General, and Arthur T. Iler Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE FULTON—Affirming.

Thomas Bass, a negro, appeals from a sentence of death following his conviction of the murder of John Brown. Grounds urged for reversal are:

(1) Error in failing to require the jury to decide whether a confession of the accused was obtained by duress or by plying with questions.

(2) Improper argument by the attorney for the commonwealth and

(3) Error in failing to instruct on the whole law of the case.

John Brown, the deceased, a 60 year old negro, rented a house in Louisville and subrented rooms. The appellant, a soldier stationed at Bowman Field, came to Louisville on June 13, 1942, and took a room at Brown's house, occupying it with two girl friends. Brown occupied one room in the house. The room adjoining his was occupied by a blind man and his daughter, Bessie Mae Young, and this room was between Brown's room and the one occupied by the appellant. Brown and the appellant did some drinking together for a day or so. The appellant testified that on June 17, the day of the killing, while he was standing on the porch, Brown and a fellow workman approached the house in company with Bessie Mae Young, who had a knife in her hand and was arguing with Brown's companion. The appellant says he quieted the woman and handed to Brown a pistol which had been dropped by his companion. Shortly after this, the appellant says, he saw Brown and Bessie Mae in bed together and after this Brown was complaining that the girl had stolen $3 from him.

Later in the afternoon appellant was invited into Brown's room. There is no controversy in the evidence except as to what happened at this time. Bessie Mae Young testified that Brown and the appellant were talking in a friendly manner when they entered the room. Shortly thereafter she heard something like a lick and Brown said, ''Aw, don't hit me,'' and then she heard him gasp. The appellant came out of the room and left. Brown had been struck in the head and was bleeding profusely and did not know anything. He was taken to the hospital and died during the night. He had been struck with a heavy hammer kept in his room for breaking up coal. The hammer was later found in the weeds near the house. Brown's pocket-

book was found in his room behind the wood box and had been torn. The appellant left the house and was arrested shortly afterwards while in company with the two girls with whom he was rooming. He had $10 in bills and some change wadded up in his pocket and also had a pint of whisky. Apparently he had spent little, if any, money before the killing.

The commonwealth introduced a confession signed and sworn to by the appellant before a notary public, containing several typewritten pages. In this confession the appellant told in detail everything done by him from the time he left Bowman Field. The material part of the confession follows: "We sat down on the side of the bed and talked for about five or ten minutes. I knew that Brown had some money and as I got up to leave I saw a hammer laying on the shelf by the door. When I saw the hammer I decided to get it and hit Brown with it and get his money. I picked up the hammer and walked back over to the bed where Brown was sitting and I hit him on the left side of his head. He fell back on the bed and I reached in his hind pocket and got his bill fold. I held it in my hand and as I went out of the house I threw the hammer down. After I got outside I opened the bill fold and got eleven or twelve dollars out of it. I put the money in my pocket and throwed the bill fold down. Then I went on up to the corner and went in the Drug Store where Frankie Bell and Gertrude was. I bought a pint of whisky in there with the money that I had gotten from Brown. I didn't tell the girls what had happened and we walked on back down to the house. I stood out on the steps and the girls went inside. They were only in there for a few minutes and they came out and Gertrude wanted to go up to her sister's house. We started up there and the police stopped us and arrested us. When I took Brown's money out of his pocket book I ripped it before I threw it down."

The confession was made in the presence of six police officers at police headquarters. No objection was made to its introduction in evidence but the appellant repudiated the material portion of it and testified that when he admitted to the officers that he had struck Brown with the hammer one of the officers hit him with a black jack and compelled him to admit that his motive was robbery. Thereupon the court, on his own motion, heard proof on this question in chambers and

found that the confession was voluntarily made. Each of the police officers denied that force or threats were used, stating that the only thing said to him was by Capt. Pate, who told him "The best thing you could do is to tell what you know about it, it is for your own good." The appellant's uncorroborated testimony as to the use of force lacks a convincing ring and we have no doubt that the court decided correctly that the confession was admissible in evidence.

From the witness stand the appellant admitted striking the deceased but claimed self-defense. His version of the affair is best stated in his own words, which were: "When I went in the room he was sitting there on the bed and I sat down and talked, commenced talking. I said I have got to go, I said, I am going around here and tell this lady what you need in the house, this lady that left out of here, Bessie, we needed things and a basin to wash out our clothes, and some pillow cases on the bed. He said, 'What do you want to go there for, you must want to do something.' I said 'That damn woman is old enough for my mama' and we started arguing and he run his hand in his pocket, and I knew he had the pistol in his pocket because the insurance man left when he was talking, with the pistol, when he went to run his hand in his pocket that was when I picked the hammer up when he ran his hand in his pocket. * * * I was scared to turn around and go out because I knew he had the pistol, I was scared he would shoot me."

It is at once apparent that the evidence was amply sufficient to sustain the verdict. It would have been so even in the absence of the confession. Having admitted the killing, it was incumbent on the appellant to justify it and the jury were not bound to accept his uncorroborated statement that he acted in self-defense, particularly since well established facts, such as the finding of the hammer in the weeds and the torn pocketbook behind the wood box, tended strongly to indicate the falsity of his story. Another such circumstance is that there was no other evidence that Brown had a pistol on his person and the pistol was actually found between the mattress and bed springs in his room.

It is argued with great earnestness that the trial court was in error in deciding the issue as to the admissibility of the confession and that he should have sub-

mitted to the jury the question whether it was obtained in violation of the Anti-Sweating Act, KRS 422.110.

Passing the question that there was no objection interposed to the introduction of the confession and no motion to exclude it after its introduction, it is clear that the court properly passed on this question himself rather than submit it to the jury. In view of the present statute, KRS 422.110, we are at a loss to understand the insistence with which this question is presented since the statute clearly vests this function in the trial judge. Prior to the enactment of Chapter 141 of the Acts of 1942 it was the function of the jury to determine, under appropriate instructions, the admissibility of a confession claimed by the accused to have been obtained in violation of the Anti-Sweating Act, but the purpose of the 1942 amendment was to abolish this practice and to vest this function in the trial judge. This identical question was decided in Herd v. Commonwealth, 294 Ky. 154, 171 S. W. (2d) 32.

It is argued, however, that such a construction of KRS 422.110 as we have indicated renders that statute unconstitutional in that it deprives the accused of the ancient mode of trial by jury guaranteed by section 7 of our Constitution. This argument is based on an erroneous conception of the ancient mode of trial by jury. Courts existed long before juries and there was no such thing in the ancient mode of trial by jury as an allotment of all questions of fact to the jury. The jury simply decided some questions of fact and the judges always decided a multitude of questions of fact forming a part of the issue. See Thayer, Preliminary Treatise on Evidence, page 185 et seq. The orthodox policy was for the judge to decide the issue as to the voluntariness of a confession and, according to Wigmore, it was an error of policy for several reasons to permit the jury to determine the admissibility of evidence merely because the admissibility depended on a question of fact. Wigmore on Evidence (3d Ed.) Sec. 861,2551.

For many years, both prior and subsequent to the adoption of the present Constitution, the orthodox practice in our jurisdiction was for the judge to determine the voluntary nature of a confession and its admissibility in evidence. Hudson v. Com., 63 Ky. 531, 2 Duv. 531; Dugan v. Com., 102 Ky. 241, 43 S. W. 418; Pearsall v. Com., 92 S. W. 589, 29 Ky. Law Rep. 222. In the

later cases the heterodox rule was announced that where there was an issue as to the voluntariness of a confession the question of fact should be submitted to the jury, leaving to their consideration the conflicting evidence and its effect in case of belief or disbelief. Billings v. Com., 223 Ky. 381, 3 S. W. (2d) 770; Gilliland v. Com., 224 Ky. 453, 6 S. W. (2d) 467; Com. v. McIntosh, 257 Ky. 465, 78 S. W. (2d) 320.

It was to abolish the rule thus established that the Act of 1942 was enacted. Clearly, the act does not violate Sec. 7 of the Constitution since it provides for a return to, and not a departure from, the ancient mode of trial by jury.

The argument by the attorney for the commonwealth complained of was his statement, "Talk about giving this man life, whoever heard of a life sentence meaning life?" We have on numerous occasions criticized this character of argument, Long v. Com., 288 Ky. 83, 155 S. W. (2d) 246, and cases therein cited, but have with almost complete uniformity held that such an argument was not prejudicial to the substantial rights of the accused, so as to require a reversal. A full discussion of this question and a review of the cases is contained in Powell v. Com., 276 Ky. 234, 123 S. W. (2d) 279, wherein we refused to reverse a death sentence because the jury were told that a life sentence was subject to parole after eight years, a stronger statement than the one complained of here. A further discussion of the question would be superfluous.

The final contention is that the court erred in failing to instruct under KRS 435.050. That statute makes guilty of a felony anyone who strikes another, not intending to cause death, not in self-defense, not in an attempt to keep the peace nor in the lawful attempt to arrest one charged with a crime, where the person struck dies within six months. There is no merit in this contention since the court gave an instruction on involuntary manslaughter embodying the substance of the statute. While involuntary manslaughter is a misdemeanor, the accused may not be heard to complain because the punishment authorized by otherwise correct instructions is less than that imposed by law.

We have carefully considered the evidence and it leaves us with little, if any, doubt that the appellant's

432

motive was robbery. He was clearly guilty of murder and the jury were amply justified in fixing the extreme penalty.

Affirmed.

Whole Court sitting.