## Adkins v. Commonwealth.

Nov. 9, 1945.

E. J. Picklesimer and John L. Harrington for appellant.

Eldon S. Dummit, Attorney General, and H. K. Spear, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE REES—Affirming.

Anderson Adkins has been convicted of the crime of murder, and his punishment fixed at death. The indictment charged him with the murder of Mrs. Jettie Johnson, wife of Tom Johnson of Pike county. The serious responsibility rests upon this court to determine whether or not prejudicial error was committed at appellant's trial in the lower court.

Anderson Adkins married Elmo Bentley, daughter of Mr. and Mrs. Fayette Bentley of Pike county, in 1933. He was then 21 years of age and she was 18. They have one child, a son, now 11 years of age. They lived in Pike county near Marrowbone in the neighborhood where their respective parents and the married brothers and sisters of Mrs. Adkins resided until 1942, when they moved to Baltimore, Maryland, where appellant obtained employment in a ship building plant. They returned to Pike county, Kentucky, in the late winter or early spring of 1944. In April, 1944, Mrs. Adkins filed suit for divorce and for the custody of the child, and while the divorce suit was pending went to Fairfield, Ohio, where she obtained employment in a defense plant. She left the child with her parents. Appellant went to Fairfield in July, 1944, for the purpose, as he claims, of effecting a reconciliation. He testified that a reconciliation was effected, but that three or four days later his wife received a letter from someone at home and thereafter refused to live with him. He returned to Pike county and went to his parents' home to live. Later a divorce was granted to Mrs. Adkins and she was given custody of the child, but appellant was given permission, either by order of court or by his divorced wife and her parents, to see his son at least once a week. He went to the home of Mr. and Mrs. Fayette Bentley practically every Saturday afternoon, got the boy, and took him to various places, sometimes to the Adkins home, sometimes to Pikeville where they attended the theatre. He usually returned the child to the Bentley home on Sunday. On February 10, 1945, he went to the Bentley home, but was refused permission to take the child with him. On the following day, about 2 o'clock in the afternoon, he appeared in an automobile at the filling station operated by Verna Long and her husband. Verna Long was the sister of his divorced wife. According to the testimony of appellant, he purchased and paid for five gallons of gasoline and then asked Verna Long to endeavor to obtain the consent of her

sister, Elmo, to his having the custody of his son. She replied: "I will write her no letter and if I can do anything to prevent it you won't be seeing Jimmy or Elmo either again." Appellant testified that he remembered nothing from that moment until he was arrested on Hurricane mountain a few hours later.

The evidence for the Commonwealth shows that appellant did purchase gasoline at the Long filling station, and that Mrs. Long waited on him. While she was standing by the side of his car, apparently engaged in conversation with him, he suddenly drew a pistol and shot her. She ran toward the rear of the car, and he got out and continued to fire his pistol. In the meantime an automobile had driven up and stopped just behind appellant's car. Mr. and Mrs. Bryce Childers were in the front seat and their child, a small girl, was riding on the rear seat. One of the bullets fired at Mrs. Long passed through the windshield of the Childers car and struck the little girl. Earl Johnson and his wife, riding in a truck, passed the filling station just as the shooting occurred, and saw appellant shoot at Mrs. Long. She fell on the paved part of the road, and appellant walked up to her body and struck her with the pistol. He reloaded his pistol, got in his car, and drove rapidly down the road to the home of Bill Goff about ½ mile away. He parked his car in front of the Goff home and walked to the house, which was located about 100 feet from the highway. He had his pistol in his hand. Mrs. Goff met him at the door and he asked for her husband, and was told that he had gone up the road, although Bill Goff at the time was in the house listening to the radio. Appellant said, "I hope I meet him; I will get him and I will get old Fayette," meaning Fayette Bentley, the father of his divorced wife. He told Mrs. Goff that he had killed Verna Long. There was proof that he had attempted to shoot Goff a few weeks before this transaction, and there was evidence from which the jury could reasonably infer that he was incensed at Goff because he believed that Goff had some part in the separation of himself and his wife. Goff was not related to the Bentley family. Appellant got in his car and drove rapidly back toward the Long filling station, where the body of Mrs. Long was still lying in the road. As he approached the home of Mr. and Mrs. Tom Johnson, which was located almost directly across the road from the filling station

and about 100 feet away, appellant suddenly applied his brakes. He was traveling at such a rapid rate of speed that the car swerved, went over an embankment, and stopped in the ditch. Mr. and Mrs. Johnson and their son-in-law, Ed Burgess, had heard the shots fired in the road in front of their home, and had walked to the front part of the yard to ascertain what had happened. They saw the body of· Mrs. Long lying in the road, and Burgess walked out in the road and placed his handkerchief over Mrs. Long's face. When appellant's car stopped in the ditch Mr. and Mrs. Johnson started back toward the house, and Mr. Johnson went around the house. Appellant followed with the pistol in his hand and overtook Mrs. Johnson just as she reached the front steps. Burgess testified as follows as to what happened at this point:

"Adkins came on up and when he got in about ten feet of Mrs. Johnson Mrs. Johnson said 'Anderson, I have never harmed you, what are you coming up here for?' and Anderson Adkins said, 'Oh yes, you have, I have come to get you,' and immediately started firing; when he raised his pistol to fire Mrs. Johnson put her hands up to her face like this (indicating) and the first shot hit her right here (indicating)."

John Thacker, the only other eyewitness to the shooting of Mrs. Johnson, testified on direct examination as follows:

"I came down to my brothers there and was up there and I heard the shooting, the shooting of Mrs. Long and I came down where Mrs. Long was lying on the road and I seen Mr. and Mrs. Johnson coming down the hill and seen that fellow over there (indicating) also coming down the hill; this other man came on down to where the woman was lying on the road and Mrs. Johnson looked down the road and seen Anderson Adkins coming up the road in a car then she took towards her house and Mr. Johnson and I took after her, and Anderson came on and wrecked his car and came on up the hill and headed her off before she got in the house and shot her. * * * He came out of the car with a gun in his hand. * * * Anderson Adkins got up to where she was and said damn you I am going to get even with you and he fired."

On cross-examination he testified in part as follows:

"Q. How far away were you when Anderson Adkins got up to where Mrs. Johnson was? A. I would say around ten feet; not over 20 feet.

"Q. And you seen Anderson Adkins have the pistol in his hand? A. Yes sir.

"Q. Did you say anything? A. Yes, I said don't do that Anderson.

"Q. Do what? A. He was going towards her with the pistol in his hand and I thought he was going to kill her.

"Q. Why did you think he was going to kill Mrs. Johnson? A. He was going towards her with the pistol in his hand but I didn't know who he was going to kill; I thought he was going to kill her.

"Q. And you told him not to do that? A. Yes I did.

"Q What did Anderson say then? A. He didn't answer.

"Q. Did he look at you? A. No sir.

"Q. What did you do then? A. I went over the bank.

"Q. Did you get over the bank before the pistol fired? A. No sir.

"Q. How soon after you said Anderson don't do that until the pistol fired? A. Just immediately after I said that.

"Q. How close was Anderson to Mr. Burgess and Mrs. Johnson then? A. I don't know exactly.

"Q. About how far? A. Well when he began shooting he was right up close to her.

"Q. How close were you to Anderson when you told Anderson not to do that? A. Maybe ten or twenty feet.

"Q. And when the pistol fired he was right up close to her? A. Yes sir.

"Q. How close, A. I don't know; maybe three or or four feet.

"Q. Did Mrs. Johnson have her hands up over her face at that time? A. She throwed her hands up to her face and was begging to him.

"Q. What did she say? A. She said I have done nothing to you Anderson, don't kill me."

On re-direct examination he was asked this question and made this answer:

"Q. When Mrs. Johnson told the defendant not to kill her, that she had done nothing to him, did the defendant make any answer to that? A. He just said 'damn you I am going to get even with you.' "

Three bullets struck Mrs. Johnson; one in the breast, one near the right eye, and one in the back. She died immediately.

On the day in question, Mr. A. E. Auxier, an attorney of Pikeville, Kentucky, was driving in an automobile with his wife from Pikeville to Elkhorn City, and reached the Long filling station just after the shooting of Mrs. Johnson. He saw the body of a woman lying in the road and drove his car onto the berm of the road and stopped. He observed a car in the ditch a short distance down the road, and saw appellant across the road from the ditched car loading his pistol. Appellant crossed the road diagonally to the Auxier car and said: "I have to have this car." Mr. and Mrs. Auxier got out of the car, appellant told them to stand back, got into the car and said, "I will do the driving," and drove off up the road. He was next seen a few minutes later on Harless creek about 2½ miles from the Long filling station. An unimproved road parallels Harless creek and connects with the main highway from Pikeville to Elkhorn City near the mouth of the creek. On this road a short distance from the main highway lived Mr. and Mrs. Fayette Bentley, parents of appellant's divorced wife, her brother, Burton Bentley, and his wife, and her sister, Mella Bentley Blackburn, and Clarence Blackburn, her husband. Appellant drove to Burton Bentley's home, but Burton was not at home. His wife and baby were in the house. Appellant rushed into the house with his pistol in his hand, and, when told that Burton was not at home, said: "I will let him do a little suffering, he is not here." Thereupon he shot Mrs. Bentley in the breast, and as she ran through the door into the next room where her baby was in a crib, he fired another bullet striking her in the arm. As she sank down on the floor appellant fired another bullet

into her head, then kicked her three times and left. Mrs. Bentley recovered and testified at the trial of this case, but we infer from the record that she is totally blind from the effects of the last shot. Appellant next went to the Blackburn home, parked his car, walked onto the porch, opened the door and walked into the dining room where Mella Blackburn and her husband were sitting at the dinner table. Mrs. Blackburn testified as follows:

"We heard footsteps on the porch and the door flew open and Anderson Adkins came in with his hand in his right pocket, and he said 'I have come after you and your mother both, what have you to say?' and he walked around and put his pistol to my back and my husband knocked the gun down and he shot my husband once through the heart and he raised the gun at him again and my husband said 'Anderson don't do that, you have shot me through,' and he shot him again in the same place and I jumped in between them and we wrestled around and finally my husband got the gun—it was a .38 pistol and my husband got hold of the pistol and he run to the front door and as he threw the gun into the creek he fell."

A little further along she said:

"While we were wrestling around Anderson had me down a time or two and I got loose, I don't know how, but I got loose and my husband was calling to me and I started out on the porch to my husband and Anderson knocked us both off the porch and came on down on me and I got loose and got him down, and Anderson said 'I have got four forever, but I have one that is innocent,' and then he asked me to let him up; I let him up and I turned and looked at my husband who was hollering for me to come to him, and Anderson said 'By God I have got four forever'; so he went on out through the gate and over to his car and was looking around in his car and I began hollering for help and Anderson went around the car and was looking in the creek for the gun, and as he came back to his car my mother-in-law was with me; after he was at the creek looking for his gun he said 'By God I will come back after you and your mother,' and hopped into the car and left."

Clarence Blackburn died within thirty minutes after

he was shot. Mrs. Blackburn found appellant's pistol in Harless creek in front of her home a few minutes after appellant left.

Counsel for appellant state in their brief that appellant went first to the Blackburn home and then to Burton Bentley's home, but, although the record is not clear on this point, a fair inference is that he went first to the Bentley home and then to the home of Clarence Blackburn. Before he reached the main highway, about ¼ mile below the Bentley home, appellant overtook a truck which had stalled and blocked the road. The truck belonged to Shannon Sawyers, who testified: "I was up at the house about 150 yards I guess from where the boys had the road blocked and Anderson came down the creek he was driving pretty fast, and I went down to see what the trouble was that they couldn't let him by; Anderson was standing near the back of the truck that wouldn't run and he said 'for mercy's sake, unblock me, I am in a hurry, I want to get by,' and then he said 'they will follow me.' We pushed the truck out of the road so he could get by and Anderson helped us push the truck out of the road." Appellant drove to the main highway and back down that highway past the Long filling station and on to the Lavisa fork of the Big Sandy river, about 8 miles beyond the filling station, where he ran the Auxier car into a ditch and abandoned it. He passed the filling station about 30 minutes after the shooting of Mrs. Johnson. A truck occupied by Scott Blackburn and Mrs. Blackburn overtook appellant, and he asked Blackburn to take him to the store operated by Hayes Justice which was located at the foot of the mountain about 400 yards up the road. Hayes Justice is appellant's cousin. While in the truck he told the Blackburns that he had killed four people, Orbin Long's wife, a Johnson woman, a Blackburn, and a Bentley. Appellant got out of the truck and went in the store where he had a short conversation with his cousin, Hayes Justice. He left the store and started up the mountain toward the Virginia state line. Two highway patrolmen, Tony Robinette and T. S. Saulisbury, arrived a few minutes later and started in pursuit of appellant. They overtook him about three miles from the store. He started to run, but Robinette fired several shots from his pistol and appellant surrendered to the officers. Robinette was asked this question and made this answer:

"Q. Did the defendant say anything when he came back to you? A. Yes, he asked us to shoot him and leave him in the mountains, and said he had killed four or five people and maybe that would be a lesson to them to keep their damn bills out of his business."

On this point, Saulisbury testified as follows:

"He told us about the trouble he was in that he had killed some four people and he would rather we would just shoot him and leave him up there, and then coming off the hill we asked him if he realized what he had done and he said yes he had killed four people and that would be a lesson to them to keep their bills out of his business."

Appellant seeks a reversal of the judgment on three grounds: (1) His motion for a continuance should have been sustained; (2) the court erred in having a jury summoned from an adjoining county; and (3) incompetent evidence which was highly prejudicial to his rights was admitted over his objections.

The first ground is wholly without merit, and is not seriously pressed. The indictment was returned February 15, 1945, and on that day appellant entered a plea of not guilty and the case was set for trial on February 28, 1945. When the case was called for trial, appellant announced that he was not ready and moved for a continuance, and in support of his motion, filed his own affidavit and the affidavit of his attorney, E. J. Picklesimer. The motion was sustained, and the case was continued to the March term of court and set for trial on March 22, 1945. It seems that the Commonwealth elected to try the appellant upon the indictment charging him with the murder of Verna Long. He was convicted and sentenced to life imprisonment. On March 28, 1945. the case in which he was charged with the murder of Mrs. Jettie Johnson was continued to the May term and set for trial on May 21, 1945. On May 14, 1945, an order was entered directing the warden of the penitentiary at LaGrange, Kentucky, to produce the appellant forthwith to the jailer of Pike county, but he was not taken to Pikeville until May 21st, the day his case was set for trial. A motion for a continuance was filed, and in an affidavit in support of the motion it was stated that appellant had had no opportunity since his trial in March for the murder of Verna Long to consult with his coun-

sel or his friends; that John L. Harrington, one of his employed attorneys, was absent; that he had ordered and paid for a transcript of the evidence heard at his trial for the murder of Verna Long, but had not received the transcript until May 21st and his attorneys had not had an opportunity to examine it. Mr. E. J. Picklesimer, who represented him at the March trial was present. The court overruled the motion and proceeded to the selection of a jury. When court adjourned for the day all members of the panel had been excused for cause except three, and all of these were peremptorily challenged the following day, two by appellant and one by the Commonwealth. The court entered an order directing the sheriff to summon a special panel of jurors from Letcher county, and court was adjourned to the following day. On May 22nd both of appellant's attorneys were present and a jury was selected from the special panel. No evidence was introduced until May 23rd. Appellant was not prejudiced by the absence of one of his attorneys on the first day of the trial, as he was represented by one competent attorney who was thoroughly familiar with the case and the only step taken in the absence of the other attorney was the examination of the jurors on the regular panel, and all of them except three were disqualified for various reasons and the three who were qualified were still on the tentative jury when both attorneys were present. The attorneys had represented appellant at the March trial and were familiar with the facts. They had ample time to examine the transscript of the evidence heard at the trial although it was not delivered until May 21st. The court did not err in overruling the motion for a continuance.

Likewise, it was not error to summon a jury from an adjoining county. The trial judge made a fair effort in good faith to satisfy himself that it would be impracticable to obtain a jury free from bias in Pike county. The appellant had been tried at the March term of court on an indictment charging him with a murder growing out of the same difficulty, and that trial had been given wide publicity in the newspapers circulating in Pike county. Out of the regular panel only three were found upon their examinations to be qualified for jury service in the case. Later these three were peremptorily challenged. Under these circumstances, the summoning of a jury from another county was not an abuse of discre-

tion. Osborne v. Commonwealth, 296 Ky. 587, 177 S. W. 2d 896; Gross v. Commonwealth, 294 Ky. 492, 172 S. W. 2d 78; Canter v. Commonwealth, 274 Ky. 508, 119 S. W. 2d 864; Johnson v. Commonwealth, 250 Ky. 297, 62 S. W. 2d 1025; Benson v. Commonwealth, 249 Ky. 328, 60 S. W. 2d 941. Furthermore, it appears from the order that it was made by the court after a conference with the attorneys for both sides and without objection being offered thereto.

It is next insisted that all of the evidence concerning the transactions which occurred prior to and subsequent to the shooting of Mrs. Johnson was incompetent and prejudicial to appellant's substantial rights, and it is argued that the evidence should have been confined to the testimony of the eyewitnesses to that shooting. The general rule is that in a criminal prosecution proof which shows or tends to show that the accused is guilty of the commission of other crimes and offenses at other times is incompetent and inadmissible for the purpose of showing the commission of the particular crime charged, but there are exceptions to this rule which are as well established as the rule itself. For instance, proof of other crimes is competent to establish identity, guilty knowledge, motive, plan, state of mind or intent. Taylor v. Commonwealth, 266 Ky. 325, 98 S. W. 2d 928; Farley v. Commonwealth, 263 Ky. 769, 93 S. W. 2d 858; Thomas v. Commonwealth, 185 Ky. 226, 214 S. W. 929. This is particularly so where the accused relies on a lack of intent or a want of guilty knowledge. Sessmer v. Commonwealth, 268 Ky. 127, 103 S. W. 2d 647. In the instant case, a showing of guilty knowledge, motive or intent, especially when appellant's defense is considered, is wholly absent if the evidence is confined to the bare facts of the killing of Mrs. Johnson. Appellant defended on the ground that he did not intend to kill Mrs. Johnson, the killing was without malice and he had no knowledge of the transaction. All of the offenses concerning which proof was admitted, including the shooting of Mrs. Johnson, occurred within a short period of time, approximately 30 minutes, and constituted one continuous transaction. It is obvious from the evidence that appellant was actuated by the same motive and had the same purpose throughout; that is, to wreak vengeance on those who, in his opinion, had interfered in his marital difficulties. This motive, his intent, state of mind and

knowledge could be established only by showing what he said and did shortly before and after the crime was committed. The following from the text of 20 Am. Jur., Evidence, section 313, is pertinent in the light of the facts of the present case:

"Whenever mental state, guilty knowledge, or scienter is an essential element of the offense charged, evidence is admissible of acts committed by the accused and his conduct at or about the time of the commission of the offense charged against him which tend to establish his knowledge or intent, his motive for the commission of the crime the absence of mistake or accident or of a common scheme, plan, or system on his part notwithstanding such evidence proves or tends to prove an offense other than that charged. In short, evidence of other crimes is admissible to prove malice or malicious intent with regard to the offense charged."

The evidence shows that appellant had made threats against members of the Bentley family and others who, as he believed, had sympathized with and assisted his divorced wife. There is no evidence that he made specific threats against Mrs. Johnson, but on one or two occasions Mrs. Anderson and her sister, Verna Long, went to the Johnson home immediately after difficulties with appellant. He was at his home a short distance away, and the Johnson home was in plain view. His statements when he shot Mrs. Johnson, coupled with his acts and statements at the scenes of the other offenses, indicate that he was influenced by the same motive in all of his acts on the occasion in question. Moreover, these statements and the statements made by him immediately after his arrest show that he realized the nature of his acts. When objections were made to the evidence of other crimes, the court properly admonished the jury as to the purpose for which it was admitted and how it was to be considered by them. McQueen v. Commonwealth, 196 Ky. 227, 244 S. W. 681. A careful examination of the record convinces us that the court protected appellant's rights fully in the admission of evidence.

The severest punishment known to the law has been meted out to the accused, but he committed a heinous crime, and there are no mitigating circumstances justifying a lesser penalty.

The judgment is affirmed.