## Fields v. Commonwealth.

February 11, 1949.

Rehearing denied May 27, 1949.

Francis M. Burke, Emmett G. Fields and H. L. Moore for appellant.

A. E. Funk, Attorney General, William F. Simpson, Assistant Attorney General, J. A. Runyon, Commonwealth's Attorney, and W. A. Daugherty for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Affirming.

The principal question is whether the evidence of legal responsibility of the appellant for the killing of two deputy sheriffs in his home was sufficient as a matter of law to take the case to the jury. His wife assumed the blame and undertook to justify her action. The homicide occurred in Letcher County, but the trial was held in Pike County on a change of venue. By consent the defendant was tried upon two indictments at the same time. The verdicts were for voluntary manslaughter, and a penalty of twenty-one years imprisonment was imposed in each case. The judgment provides that the terms shall be served consecutively and not concurrently.

The appellant, Leonard Fields, and his wife, Lona, were engaged in bootlegging at their home on the Cumberland River between Whitesburg and Harlan. In the late afternoon of December 20, 1947, a crowd of men had gathered there and engaged in drinking and gambling. The appellant was intoxicated, though his wife testified he was not "plumb drunk" but only "pretty high," which condition she defined as being "a little above half drunk." They described the party as being a group of

neighbors having a pre-Christmas celebration. Coy Boggs' wife came there to take him home. A quarrel followed between her and Mrs. Fields, and then, according to Mrs. Boggs and her son, she and he were assaulted in the yard by the appellant and shot at by his son, Charlie. The description of this encounter by Fields is just the reverse. Palmer Boggs went to Whitesburg for the officers. Earlier that afternoon Galloway had procured a warrant of arrest for Willard Collier on the charge of public drunkenness. Galloway and Willard Hall, another deputy sheriff, left town around six o'clock to go to Fields' house. He was expecting to find Collier there. They were accompanied by Herman G. Combs, the sheriff, and his son-in-law, Joseph W. McWilliams. They got to the house somewhere around seven o'clock.

As the two deputy sheriffs went up to the house from the car they met Orbin Holbrook coming away. They delivered him to the sheriff in the car in the road. Holbrook testified that he had just come there to get some liquor but was told by Charlie Fields that, "The law would be there in fifteen minutes or less; someone had called him." He added, "I says, 'This is no place for me,' and walked out. As I came out of the door Charlie said, 'There's the law now.'"

The officers, who were in uniform and known by the defendant and his family to be officers, entered the house. Two shots were heard. Palmer Boggs, who lived across the road, stated it was "only a few seconds" after they entered; that "they couldn't have had time to more than walk through the dining room." He would not undertake to say how quick in succession the shots were, saying, "It seemed to me like they were together—both shots." Holbrook estimated the time as four or five minutes after the officers left him at the automobile and illustrated the time between the shots by a clap of his hands. Combs, the sheriff, testified the shots were fired "about the time" the officers got into the house. Said he, "Both shots echoed the same sound" and illustrated the difference by clapping his hands. The witness was positive there were only two shots fired and expressed the opinion that they were from a shotgun and neither was from a pistol. He also related that about the time the officers got to or inside the house the lights went out in the back part. McWilliams testified, "When they entered the building, there was a very short lapse of time

until we heard two shots." He heard none other. He gave the same demonstration as to the time between shots. Obviously these demonstrations mean nothing to the reader of the record, but that method is ordinarily used to indicate a very brief intervening period.

Combs and McWilliams immediately ran to the house. The door was locked. One after the other peered through a window, the lower part of which was screened so as to obstruct a view within. McWilliams, who first looked, saw Fields in a "crouched position" with a "determined look" and with his wife and son holding him back. Combs saw the appellant, Leonard Fields, moving about with his arms around his son. They could see one of the officers on the floor. They quickly returned to Whitesburg to summon aid. The distance is seven or eight miles, and it appears an hour or more elapsed before the sheriff and other officers returned to the scene. Meanwhile, the appellant had come to the courthouse drunk and "was telling" about the killing.

When the officers entered the house, Hall's body was on the floor of the bedroom and Galloway's was in the dining room, both near the door between them and about four feet apart. Both men had been shot in front with a shotgun. One empty shell was found in the house that night and another picked up in the yard two or three days later. Charlie Fields produced a single-barrel shotgun, which had been recently fired. Another combined shotgun and rifle, which belonged to the Boggs boy and had been taken from him in the first altercation, was produced, but it had not been recently fired. A thirty-eight pistol was by Galloway's body. It was cocked with the hammer up. A forty-four pistol was by Hall's body. Each contained one empty hull. A forty-four bullet was later extracted from a door casing. The single-barrel shotgun was not automatic, and it was necessary to break it down and pull out the exploded shell and reload it.

We summarize the more essential portions of the appellant's evidence. By the time the officers arrived all of his guests had gone except Willard Collier. Mrs. Fields was preparing supper. She told the appellant, "The law is here," and he replied, "Tell them to come in." Galloway told Collier he had a warrant for his arrest, and Collier demanded that he show it. He then asked Fields where his liquor was, and he responded by

asking if the officer had a search warrant. Galloway stated he had none, and with pistols drawn by both Galloway and Hall, Galloway told Fields: "Don't get smart. I'll just take you. Come on out from behind there." He then stepped back and pointed his pistol at him. The defendant put up his hands and said: "Lord, have mercy. Don't shoot me." His wife ran up behind Galloway, took him by the arm, and said, "Dave, don't shoot him." Galloway pushed her back and told her to "stay out of this." Lona Fields corroborated her husband and testified that, when Galloway had knocked her away, she got the shotgun from a rack in the back room. It was loaded. She got an extra shell from a hunting coat. When she came back to the dining room, Galloway fired in her direction and she fired the shotgun at him about the same time. She stepped back into the hall and reloaded the gun. When Hall fired at her husband and Collier, she turned and shot Hall. She had done this in defense of herself and of her husband.

Mrs. Fields testified that she had been selling liquor in local option territory for about three months and paying Herman Combs, the sheriff, $50 a month for protection. Galloway and Hall were collectors of the money. She detailed several meetings and payments. She also testified that the officers had got mad at her because she was not buying whiskey from the sheriff but in Virgniia where she could get it cheaper. Hall had $2,800 in his pocket in large denominations. All of this was denied by Combs, who stated that he had never seen Lona Fields until the night of the killing. The court admonished the jury not to regard this testimony but, nevertheless, permitted vigorous cross-examination of the witnesses on the point.

In this jurisdiction where the accused admits or is shown to have committed a homicide and endeavors to justify it on the ground of self-defense, it is incumbent on him to satisfy the jury that the killing was excusable. The defense must be convincingly established. This onus on the defendant is not a switch of the burden of proof, for it continues upon the Commonwealth until the end of the case. It is but an obligation to prove justification. Moore v. Commonwealth, 7 Ky. Opin. 218; Bass v. Commonwealth, 296 Ky. 426, 177 S. W. 2d 386, certiorari denied 323 U. S. 745, 65 S. Ct. 64, 89 L. Ed. 596. The rule

applies where the defendant on trial seeks to exculpate himself by showing that another person did the killing in his defense, for he is but lawfully doing for another whatever he may have done for himself. Adkins v. Commonwealth, 293 Ky. 329, 168 S. W. 2d 1008. In that case, though holding that the undisputed evidence clearly established a justifiable homicide in defense of another person, we observed: "It is seldom that a verdict of acquittal in a homicide case should be directed, especially where the defendant admits the killing or it is clearly proved that he did so because of the necessity of a defendant, as a practical matter, establishing a legal excuse for justification, although theoretically the burden of proving that the homicide was without such excuse remains to the end on the prosecution."

In the presnt case we have two police officers, whose coming was expected, being freely admitted into the house of the defendant whose drunken condition and lawlessness afforded a motive for assaulting them. He was in a belligerent attitude. The door was locked behind the officers and some of the lights in the house put out. Immediately and in quick succession two shotgun shots were fired and none other. The two officers were killed in separate rooms. The defendant was immediately seen struggling with his wife and son with a "determined look" on his countenance. Though the shots may have been fired by the wife, also a lawless person, it is not at all an unreasonable inference that there was a prearrangement or conspiracy between them to resist the officers or to assault or kill them. It was not necessary to show that such a prearrangement was by express word for the surrounding facts and circumstances may be sufficient to establish it. That is the ruling in Smallwood v. Commonwealth, 200 Ky. 582, 255 S. W. 106, where the giving of an instruction on murder committed pursuant to a conspiracy was largely predicated upon the fact that the wounds on the dead man showed that two guns had been used and two men had been present at the point from which the shots were fired and that the codefendants were boon companions and enemies of the deceased. Of like effect are Meek v. Commonwealth, 214 Ky. 572, 283 S. W. 1032; Taylor v. Commonwealth, 301 Ky. 109, 190 S. W. 2d 1003. Even so, it is not essential to conviction of one as an aider and abettor of a person who actually killed another that there should have been a pre-

arrangement, planning or concert of action in accomplishing the homicide. One is guilty if he, being present, shared the criminal intent and instigated, encouraged or aided the other in some manner by an overt action or an oral expression. English v. Commonwealth, 240 Ky. 446, 42 S. W. 2d 706; Kinder v. Commonwealth, 262 Ky. 840, 91 S. W. 2d 530. In either case—of a conspiracy or of aiding and abetting—it is not of material consequence on the question of guilt whether the defendant, Fields, or his wife fired the shots.

True, the testimony of the defendant and his wife exculpates him. And there was no other eyewitness introduced to contradict them. Neither their son, Charlie Fields, nor Willard Collier, the only other living persons present, was offered as a witness. The circumstances justified the jury in rejecting their story. It would be an unusual situation for two officers voluntarily admitted into the house to go in with drawn pistols and immediately raise a row and commit an assault without more provocation than the defendant and his wife related. It is to be remembered that perhaps two hours had elapsed before anyone else entered the building. The four parties were alone. No outsider heard any pistol shot. They heard only two shots from a shotgun, fired in quick succession. The jury could well have believed that in the midst of the fight between the officers and her husband the woman did not go into another room, obtain the shotgun, return and fire it at one man, then manually reload it and fire at the other in such quick succession. It is to be remembered that only one shell was found in the house that night. It is a reasonable conclusion that two different shotguns were used on this occasion. It is a well settled rule of law that the jury may disbelieve the defendant's evidence and accept the version of witnesses for the Commonwealth. It is only where the evidence of his defense or of defense of another is so consistent with that of the prosecution or is so overwhelming in probative value or effect as to afford no real issue of fact that a directed verdict of acquittal should be given. We are of opinion that the court properly overruled the defendant's motion for a directed verdict. Gilbert v. Commonwealth, 228 Ky. 19, 14 S. W. 2d 194; Vanover v. Commonwealth, 246 Ky. 32, 54 S. W .2d 375; Quinn v. Commonwealth, 260 Ky. 690, 86 S. W. 2d 328; Canter v. Commonwealth, 274 Ky. 508, 119 S. W. 2d 864; Fields

v. Commonwealth, 275 Ky. 136, 120 S. W. 2d 1021; Bass v. Commonwealth, 296 Ky. 426, 177 S. W. 2d 386.

There was no objection interposed by the defendant to the evidence of the altercation with Mrs. Boggs and her son. At the close of the Commonwealth's evidence, however, the defendant moved the court to instruct the jury not to consider Mrs. Boggs' testimony concerning that trouble. When the motion had been overruled, he asked that the jury be admonished to consider the evidence only for the purpose of showing the defendant's state of mind at the time of the killing, if it did so. The court gave that admonition. We think the ruling was proper. While perhaps too much detail was permitted during the cross-examination of the defendant and his wife, the occurrence was relevant to the issue. The Commonwealth was depending upon circumstances to connect this particular defendant with the homicides. The respective indictments charged that the killing was committed pursuant to a conspiracy, or by this defendant as principal, or as an aider or abettor of those jointly indicted with him, namely, his wife, his son, and Collier. The evidence tending to show an angry, hostile state of mind and conduct was relevant to show a criminal intent. Fields and his wife were expecting these officers because of this fight. It occurred within two hours of the killing and became a part of the whole story. It threw light upon the circumstances surrounding the killing of the officers. Lester v. Commonwealth, 239 Ky. 703, 40 S. W. 2d 306; Burke v. Commonwealth, 252 Ky. 34, 66 S. W. 2d 21; Adkins v. Commonwealth, 301 Ky. 384, 191 S. W. 2d 935.

We find no error in the instructions.

The judgment is affirmed.

Judge Cammack dissenting.

Judge Helm not sitting.