## RICHIE v. COMMONWEALTH.

Court of Appeals of Kentucky.

Oct. 19, 1951.

Alva A. Hollon, Hazard, for appellant.

A. E. Funk, Atty. Gen., W. Owen Keller, Asst. Atty. Gen., for appellee.

STANLEY, Commissioner.

The appellant, Mary Miller Richie, after two hung juries, was convicted of voluntary manslaughter for the killing of her husband, Kerman Richie, and sentenced to five years' imprisonment. She seeks a reversal of the judgment upon the ground that such a clear case of self-defense was established the court should have directed an acquittal. Other points raised need not be considered.

We first recite the undisputed facts. The parties, with their four small children, lived on Bear Branch of Troublesome Creek in Knott County. Their home was inaccessible except on horseback or by a sled. The decedent was a part time miner and part time moonshiner. His reputation was that of a "bad man" who was "awful mean" when drunk, which seems to have been quite a normal condition. He and Mose Combs had made a "run" of moonshine for their personal use and had been drunk for three days. A short while before he was killed, Richie had gone on a rampage and broken up all the family's dishes. His wife testified, "He didn't leave a dish to eat stuff out of. When he died we didn't have no dishes to eat out of." In the afternoon of March 13, 1949, Richie, Combs and the appellant's brother, Leslie Miller, and Harold Gene Yeary, a sixteen year old boy, gathered at the Richie's home for an orgy of drinking. We quote the appellant's undisputed testimony, given in the vernacular of the backwoods, as a vivid description of what occurred upon her return from a neighbor's in the late morning.

"I rode the mare down thar and carried the clothes back in front of me. When I got back to the house Kerman and Mose was in the house and Mose was drunk and the little girls was thar and my little boys was scattered out. He never did whup the little girls none. I asked him whar the boys was. He said he didn't know unless the nasty stinking things had run off. He said he was going to whup them. He said he had done and whupped Jink and was going to whup him some more. I hollered for Jink. He was over in the woods thar and he come out of the hill crying. I said, 'What's the matter, Jink?' He said, 'Daddy about beat me to death.' I said, 'Whatever for?' He just pulled his shirt off and I seed the blood was cut out of his back. There was gashes in the youngun's back six or seven inches long. He said, 'Daddy whipped me trying to make me get him the gun to kill you with as you come back up the holler.' He said, 'I told him I wouldn't get the gun 'cause you was my mommy.' He said, 'When he turned me loose to get him another switch, I got gone.' Kerman was always trying to waylay us and kill us and

beating on the younguns." "Q. What did you notice about the child's appearance? A. Thar was gashes cut all over his body." "Q. What did Kerman say if anything when the child told you that? A. He told the youngun he'd whup him for lying and the youngun looked straight at his daddy and told his daddy, 'You're telling a lie.' He give his daddy the lie. Kerman said he'd whup him and started to but I said, 'No, Kerman, you'll not whup the youngun now 'cause the youngun told the truth."

That afternoon, before his party arrived, Richie had "got after" his wife with a club and she, with her baby, had run "over thar" on the hill. It seems she returned to the house when the men got there. Continuing her story—

"Well, he was settin' out in the yard and standing around and Kerman was carrying that club thar around in his hand. I wouldn't mess around where he was at much. I was afraid of him. He kept circuling around and around me with the club, and directly a little old black cat come up behind him. It was a little old cat one of the younguns had there. He picked it up and throwed it in my face and eyes. That made me mad. In a few minutes I picked it up and slung it back at him and told him I wished it would scratch him. He walked up to me with the club and I kinda sauntered off. They was all standing there wasn't saying nothing. He asked Leslie and Harold Gene to drink with him and Leslie told him he was sick, had a hurting in his side, and didn't want to drink. Leslie told him he'd started over to Aster's to get him some backer. I sent the little boy Jink over to the store to get him some backer. Leslie was sick. They rested around until late afternoon and Kerman wanting to take that club in and kill all of them. They was nobody but Mose and the younguns in the house. Mose was down drunk. Leslie said, 'Kerman, I don't believe I would go in there and hurt anybody, especially the younguns. Don't kill your younguns.'"

There is corroboration of all this, including the use of the cat as a weapon of offense and defense, which, we may observe, was pretty tough on the cat, even a black cat.

It may be here added the evidence reveals the appellant herself is not a model of culture or a paragon of virtue.

Thus, we have the setting for the more tragic scene coming on that night.

The Commonwealth relied for conviction upon the testimony of young Yeary. He testified that he was "pretty drunk," as were Richie and Miller, and that Mose Combs was "plum drunk." Richie had had Miller "stew up" the liquor, which was defined as putting in sugar and water and heating the moonshine "to make it hotter." Mose was too drunk to know what happened and was not introduced as a witness.

Yeary testified they were all sitting around the fire, the children having been put to bed in the next room, and Richie and his wife were fussing. He told her to "pack your God damn clothes and leave." She replied, "I don't want to leave my home tonight, Kerman." She left the room, and he followed her out. The witness heard a noise which "sounded like two somebodies running across the porch," then a gun fire. Richie fell back through the doorway, partly within the room where he and the other two men were. He did not see Richie with any weapon, though, as he added, "there could have been one there for it was dark." The witness identified a rough hewn ax handle as being the club which Richie had that afternoon when he was "a settin' on the hill above the house" before he threw the black cat at Mary. This club was found early the next morning on the floor close to the door through which Richie had fallen.

Hiram Jink Richie, father of the deceased, came to the house early that morning, about the time "the chickens was crowing." He saw blood where his son had fallen, but the club was not there. When he asked, "Mary, how happened this?", she replied, "I don't know. I went to Aster Francis' store and I don't know how it happened." The store was "over the gap of the mountain a little ways." That is such an unlikely statement that telling it discredits the witness and destroys his testimony that the club was not there at that time.

The defendant admitted having said Kerman had killed himself, but went on to explain she meant that he had brought about his own death by his attack upon her.

This was all the evidence of the prosecution except testimony of a few indefinite and remote threats or statements in the nature of threats by the defendant against her husband. One was made during a violent quarrel between them, and another, uncommunicated, was related by a garrulous old woman as having been said five or six months before the killing while she was pretending to read Mary's palm as a fortune teller. There is proof also that the deceased had threatened to get rid of his wife. A short time before, cursing her and his children, he said to a neighbor he was going home and kill them all, pile them up and blow them into eternity with a case of dynamite. Considering the characteristics of the man and woman, these impress us as but little more than reflections of their rough and turbulent lives.

At the expense of space we quote the defendant's account of the immediate events because of its natural and vivid character. She testified:

"I was setting there by the fire and all at once he told me to get my clothes and leave. I said, 'Kerman, it's dark. I don't want to leave my younguns they're in here away from the fire and they might get the cover off and freeze.' I knew my baby would get the cover off. He said, 'If you don't get your clothes and go goddamn you I'll kill you.' I said, 'You'll just have to kill me I ain't leaving.' I just sot thar a minute. Then I got up and went out of the house. Kerman followed me out on the porch. He was wanting to fight me. He stepped out on the ground and I was standing on the porch. I says, 'Kerman, I ain't going to fight you.' I had been sick three or four days and so I went back in the house and sot down. He come back in then and sot awhile. They was all talking. I wasn't saying nairy word. All at once after he'd sot thar awhile he jumped up right plum quick right above me. I was scared. He said, 'Mary, goddamn you ain't

you going to go?' I said, 'Kerman, what's the matter with you?' I said, 'You set down and act like a man.' He said, 'If you don't go I'll get shed of you if I have to kill you.' I said, 'Well, I'm going to have to leave.' I got up and went out and sot down in the yard. I figured I'd have to leave and I didn't want to leave my little younguns. I knowed if he'd got me run off he'd pull my little younguns out of bed whup them trying to make them find the old gun for him. It was cold time and I sot out there didn't have on enough to keep warm and I had no whar to go, it night and dark, and directly I heard someone slipping through the porch. I looked up could see the end of the porch and seen it was Kerman. He come on out and picked up a club. I broke to run. The house is fenced in with pailings nailed to the house. I didn't have much chance getting away. I broke up under the floor of the house getting away from him. Front of the house kindly high off the ground but not much high at the back. I knowed whar the nine yar old boy keep his 22 sometimes under thar in the dry behind the chimney. I had bought the 22 for him. He had kept her hid out so much keeping her hid from Kerman she was about rusty and ruined. I broke up under the house and I thought about the gun and I thought I'd see if she war thar and if I found her I'd take her with me to keep Kerman from getting her. She was right up against the wall against the chimney. I broke on up through under the floor. The back of the house is about this high off the ground. I crawled on my hands and knees out from under thar and I looked back and seen Kerman coming up under thar after me. I was going to go back under thar and wait for him to go back in the house but he'd found out I was under thar. * * * I broke toward the end of the porch with the gun in my hand. He'd broke around toward me heading me off. I had to jump up on the end of the porch and he was getting close when I jumped up on the end of the porch. He was very near as close to me then as to them women thar. I broke on through the house and he come on after me with

that club in his hand. He had sot it down against the wall when he went in the house that evening. I come on through the house in the kitchen and Kerman come on through the kitchen after me. He had me cornered. He said, 'I have got you now, I have got you right whar I want you.' I said, 'Kerman, you better go on back.' He said, 'Goddamn you I've got you now. Right here is whar I get you.' * * * He was in the room whar the kids was at in the front room. I didn't have no way to get out of thar. It was about five feet from the kitchen door to the ground and we kept the door latched. I didn't have no time to unlatch the kitchen door and get out. I backed off. I said, 'Kerman, don't you come any closer.' He kept coming on and got close to the door. The rooms are just twelve feet. They're little. I knew I had no chance. He just coming toward me. I fired the gun. * * *

"Q. What did you do then? A. Just opened the kitchen door and jumped out after I shot him.

"Q. Did you take the gun with you? A. I took the gun outside the house and sot her down. I sot down out thar awhile. I was sorry and hurt he'd made me do it."

The testimony of the defendant's brother, Leslie Miller, concerning the deceased's violent command that his wife leave their home, and of his following her out of the room, as well as two persons running just before the shot fired, is the same as that of the Yeary boy.

When a defendant admits, or is shown to have committed the homicide, and endeavors to excuse his act on the ground of self-defense, it is incumbent upon him to convincingly establish that justification. We have many cases holding that though the defendant, who was the sole immediate eyewitness, testifies to a prima facie case of self-defense, yet if there is any evidence tending to disprove his testimony, the issue should be submitted to the jury. The circumstances of the case, or the credibility of the witness, or the inherent improbability of his testimony, may refute the claim that he killed the person in defense of his life, or to save himself from serious bodily harm. Compton v. Com., 266 Ky. 803, 100 S.W.2d 813, is typical.

However, "where the evidence * * * is so consistent with that of the prosecution or is so overwhelming in probative value or effect as to afford no real issue of fact", as stated in Fields v. Commonwealth, 310 Ky. 162, 219 S.W.2d 991, 994, or, as more generally stated, where it conclusively appears that the act of killing was in self-defense and was not with criminal intent, there is failure of proof. In such a case it becomes the duty of the trial court to direct a verdict of acquittal, for the right to defend one's life is a right of nature, recognized in every court of justice. Privitt v. Commonwealth, 271 Ky. 665, 113 S.W.2d 49.

In the present case, the Commonwealth proved some threats made by the defendant, and some statements indicating she wanted to be rid of her husband, as we have related. The purpose of receiving evidence of threats or statements in the nature of threats by the defendant against the life of the person he is accused of killing is to show his state of mind at the time of the killing as illustrating whether the one or the other party was the aggressor where there is a plea of self-defense, or as tending to prove probability that the accused in fact committed the homicide where he denies it. Hart v. Commonwealth, 85 Ky. 77, 2 S.W. 673, 8 Ky.Law Rep. 714. Under the circumstances of this case the statements are of little significance or weight for the immediate actions of both parties were precipitate rather than deliberate, although the fiery liquor may have inflamed the brutal husband's brooding purpose.

The Commonwealth's evidence contains no contradiction, direct or circumstantial, of the defendant's clear case of self-defense. There is no basis whatever for the view that her danger was not fiercely real. The preceding events and contemporaneous circumstances afford no contradiction of her graphic story of a clear right to defend herself. They support it strongly. The Commonwealth proved as being certain: (1) the deceased's drunken

violence and pursuit of his wife, and (2) the absence of an aggressive attack or of any provocation on her part. And, quite close to being equally absolute, is the presence, right where the man was shot, of the club with which he had attacked her during the afternoon. See a similar tragic story, where a daughter killed her father in defense of her mother related in Jones v. Commonwealth, 241 Ky. 717, 44 S.W.2d 1075, in which we held a verdict of acquittal should have been directed.

As stated in Minix v. Commonwealth, 266 Ky. 801, 100 S.W.2d 825, 826, "it would be difficult to write out a clearer case of self-defense."

We have sometimes criticized or condemned a record for manifest inaccuracy or for confusing or messy form. It is a pleasure to compliment the official stenographer of the Knott Circuit Court upon the present reporting and transcript.

The judgment is reversed. If the evidence is the same on another trial, the court should peremptorily instruct the jury to find the defendant not guilty.