John BAKER, Appellant,

v.

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

March 13, 1959.

Fritz Krueger, Somerset, Cabell Francis, Stanford, for appellant.

Jo M. Ferguson, Atty. Gen., Edward L. Fossett, Asst. Atty. Gen., for appellee.

BIRD, Judge.

John Baker was convicted of wilful murder in the slaying of Donald Rogers. He was sentenced to life imprisonment and he appeals.

He complains of errors in the admission and rejection of evidence. He does not state the grounds upon which he charges error in any of the rulings. We therefore will not undertake to determine the merit of his contention on the point.

He complains that one of the jurors failed on voir dire examination to divulge her relationship to Donald Rogers. Parties are entitled to truthful information upon voir dire examination for the purpose of assisting them in the exercise of

their challenges. The litigant cannot complain however unless the answer adversely affects his right of challenge. If the litigant knows of the alleged relationship at the time of trial then the right to challenge would in no way be impaired. The defendant in this case fails to show that he had no knowledge of the alleged relationship at that time. In Wyatt v. Commonwealth, 255 Ky. 454, 74 S.W.2d 928, 929, we held as follows:

" * * * Furthermore, it was the duty of the appellant to show that he was ignorant of the relationship at the time of the trial and did not learn of it until after the verdict. Appellant's affidavit was not filed and there is no proof tending to show that he was ignorant of the relationship when the trial occurred. It appears that appellant is the son-in-law of J. M. Holeman, a half-brother of Gordon Holeman, the prosecuting witness and, under the circumstances, it is reasonable to assume, in the absence of proof to the contrary, that he knew of the relationship between Carver and the prosecuting witness. As said in Crum v. Commonwealth, 209 Ky. 823, 273 S.W. 520, 521: 'If he was aware of that fact, it was evidently his duty to move for a discharge of the jury, and, if he failed to do so, and risked his chances with the disqualified juror, he waived the objection, and cannot insist on it on this appeal.' "

The defendant did not meet the requirements of the foregoing rule, and if there was a failure to divulge the relationship it cannot be considered on this appeal. See also Reed v. Commonwealth, 273 Ky. 607, 117 S.W.2d 589, 116 A.L.R. 673.

■ He further claims that the court erred in failing to instruct the jury on the whole law of the case. We find upon examination of the record that his sole plea was that of self defense. We likewise find that the omission about which he complains was in no way pertinent to that defense, and did not deprive him of any defense to which he was entitled under the law. This Court is of the opinion that the trial court gave the whole law in its instructions to the jury.

■ He next contends that the trial court erred in not sustaining his motion for a directed verdict. Let us look at the evidence.

By prearrangement, Donald Rogers and Earl Rogers were to meet with John Baker and Herschel Baker at the Baker home for the purpose of going on a coon hunt. The record discloses no previous trouble between the Bakers and the Rogers. Earl Rogers did not go to the Baker home as planned. Donald Rogers and Herschel Baker went to the Baker home together. They had whiskey with them and had been drinking when they arrived at the Baker home. The defendant, John Baker, was there when they came at about five o'clock in the afternoon. No other persons were at the Baker home until after the killing which occurred in the Baker home shortly before midnight. The three men drank together until about nine thirty that night when John went to bed. Donald Rogers and Herschel Baker continued drinking until about eleven o'clock when the trouble started and Donald Rogers was killed.

On trial the defendant gave this testimony:

"Q. 59. Did you go to sleep? A. No.

"Q. 60. How long did you remain in bed? A. Along about ten o'clock— about eleven o'clock he dragged me out of the bed, he got mean with my brother, first.

"Q. 61. What do you mean 'got mean with your brother'? A. My brother after I went to bed said, we better go to bed, he said John is already in bed, it made him mad, he reached over and slapped my brother in the mouth, he was setting on the

floor, and my brother in a chair, he reached over and slapped my brother in the mouth.

"Q. 62. Did anything happen when he smacked your brother in the mouth? A. No.

"Q. 63. What did your brother say? A. He didn't say nothing.

"Q. 64. Then what occurred, you say that was about eleven o'clock? A. That was about ten o'clock when that happened.

"Q. 65. All right, what happened then? A. Along about eleven he come and dragged me out of the bed.

"Q. 66. How did he drag you out? A. He called me a God damned son of a bitch and dragged me by my leg and got me on the floor, I talked to him, trying to keep him off of me, he went and set in a chair and in about thirty minutes I got back in the bed, well, he come back on me in about thirty minutes and called me a God damned yellow son of a bitch and says, you ain't got the guts to fight.

"Q. 67. When he drug you out of the bed the first time, tell the jury if you refused to fight with him or made any effort to fight with him? A. No, I refused, talked good to him.

"Q. 70. When he yanked you out of the bed the second time what position did that put you in? A. It put me out in the floor, quilts and all, I gave him a little shove back with my feet, and he staggered back.

"Q. 71. How did you shove him back? A. I was sitting on the floor, I give him a little shove like that.

"Q. 72. What effect did that have on him? A. That put him up close to the mantle, I scooted on trying to get out of the quilts, my feet was tangled up in them, I couldn't get up, he reached over by the bin, the side of the hearth and got a poker and started at me and got, I would say, about a couple of steps, the gun was setting here—

"Q. 73. What kind of a gun did you have there? A. A twenty two Remington automatic rifle.

"Q. 74. Where was the gun sitting with reference to the side of your bed? A. It was setting—here is the bed, here is the table, it was setting next to the table.

"Q. 75. The lamp table was between the rifle and the bed? A. That's right.

"Q. 76. What was the rifle leaning against, if anything? A. The window casing.

"Q. 77. You got your rifle? A. I did.

"Q. 78. In what position were you still? A. I was still in the floor, setting in the floor.

"Q. 79. What did you do? A. I just began shooting, I knowed he was coming at me with that poker, I knowed it wouldn't do for him to get to me as mad as he was."

Herschel Baker, defendant's brother and codefendant, corroborates the foregoing testimony. There were no other eyewitnesses to the shooting.

The defense takes the position that there is no evidence in the case contradicting the testimony of the Bakers and that the jury, from the evidence, could believe nothing other than appellant's claim of self defense. Appellant therefore insists that the trial court had no issue to submit to the jury and should have directed a verdict of not guilty.

We must determine the merit of that contention from other evidence in the case.

About six o'clock on the morning after the killing John Baker and Herschel Baker left the dead man at their home and went

to the home of Mason Hale about a half mile away. Mrs. Hale testified as follows:

"Q. 22. Tell the jury what statement he made, if any, in regard to the death of Donald Rogers? A. When he come up on the step he said we are in trouble we've killed a man, I asked him where it happened he said, up at the house, he said I'll come in and tell you all about it, you can go get the law.

"Q. 23. Who did he say he'd killed? A. Donald Rogers, I asked him who it was, he said it was Donald Rogers."

After the foregoing statement was made John Baker and Herschel Baker in the presence of each other and members of the Hale household undertook to tell how the killing occurred.

They said it occurred just before midnight and related to the Hales how Donald Rogers had twice tried to pull John out of bed and how John had shot Donald on the second attempt. Neither John nor Herschel Baker said anything to the Hales about Donald's calling John Baker vile names. They made no mention to them of John Baker being on the floor or being tangled up in the quilts. They did not tell the Hales of Donald Rogers striking Herschel Baker and they said nothing to the Hales about Donald's threatened attack with the poker. On the other hand Mason Hale testified as follows on John Baker's statement:

"Q. 69. Did he tell you what he shot him with? A. He said he—shot him with my rifle, he said he kept it setting by his bed and he said he got it and pointed it toward him and Donald tried to knock it down, he said he guessed he emptied it in him.

"Q. 70. He said Rogers tried to knock it down? A. Yes, sir."

Herschel Baker in the presence of the defendant, John Baker, told the Hales that they watched Donald Rogers die and that it took him about two hours to die. This is in sharp conflict with their testimony at the trial wherein it was stated that Donald lived only a few minutes.

Ira Hale and the Coroner, Kenneth Gibbs, testified that John Baker told them substantially the same thing that had been related to Mason Hale and his wife. According to their testimony neither John Baker nor Herschel Baker said anything about the abusive language, about being tangled up in the quilts on the floor, or about a threatened attack with an iron poker.

There is evidence that an iron poker and shovel were lying parallel in the ashes on the hearth. The testimony shows that the defendant while there with the officer did not point out the offending weapon although it was in plain view. The testimony shows that he said nothing of an assault with a poker. Baker says the first man he told about the poker was his lawyer. The coroner testified as follows:

"Q. 58. What did he say? A. In the company of the Sheriff, we asked John and his brother, Herschel what happened, he told us a complete story, well, that he was at his home the afternoon of December 20th and that Donald Rogers and Herschel had come from town about four or four thirty, he said they were the best of friends, they were talking together and visiting in the house and John Baker told me that he went to bed, the three of them had been drinking and that Donald pulled him out of bed, he told him he didn't want to get up and went back to bed, later on in the night, he stated to me, that Donald Rogers drug him from the bed again and that he wouldn't leave him alone and that he had to shoot him."

With the testimony of the three Hales and the coroner, the truth of the poker story became an issue of fact to be determined by the jury. While the defendant and his brother may have told the truth, it was nevertheless the duty of the trial judge to submit the issue to the jury. It is our opinion that the verdict reached by the jury is am-

ply supported by the evidence. In this case we shall apply the rule enunciated in the case of Schull v. Commonwealth, 310 Ky. 319, 220 S.W.2d 842, 844. We said:

"The testimony for the Commonwealth established the killing and the testimony for the defendant sought to establish that he acted in self defense. Where the accused admits or is shown by the evidence to have committed a homicide and seeks to justify it on the ground of self defense, it is incumbent on him to satisfy the jury that the killing was excusable and the defense must be convincingly established. The jury were not bound to accept his testimony that he acted in self defense and it is evident that they did not believe his testimony and concluded that the killing was unnecessary. We cannot say that the evidence was not sufficient to support the verdict or that it was given as a result of passion and prejudice."

See also Minix v. Commonwealth, 266 Ky. 801, 100 S.W.2d 825; Richie v. Commonwealth, Ky., 242 S.W.2d 1000.

We find no prejudicial error and the judgment is therefore affirmed.