**Col MONROE, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

Feb. 10, 1961.

John Rose, Columbia, Hobson L. James, Elizabethtown, Raymond Bossmeyer, W. S. Heidenberg, Louisville, for appellant.

John B. Breckinridge, Atty. Gen., Wayne J. Carroll, Asst. Atty. Gen., for appellee.

BIRD, Chief Justice.

Col Monroe, a merchant, shot and killed Carroll Vertrees. He was indicted for wilful murder and convicted of voluntary manslaughter. His punishment was fixed at confinement in the penitentiary for a period of twelve years. He appeals.

He complains that the evidence does not support the verdict.

Col Monroe and his son, Bill Monroe, and Carroll Vertrees and his son, Bobby Vertrees, had been drinking together for several hours. One Riley Cecil joined the crowd when he came to pay Col Monroe a grocery bill. The five of them, Col Monroe, Bill Monroe, Carroll Vertrees, Bobby Vertrees and Riley Cecil, got in Carroll Vertrees' automobile and started toward Elizabethtown. Carroll Vertrees was driving. When they approached the city limits of Elizabethtown an altercation began. The car was stopped and Carroll Vertrees and Col Monroe got out on opposite sides of the car and went to the back of the car, where the shooting occurred.

Bill Monroe, Riley Cecil and Bobby Vertrees testified as to what occurred at the time of the shooting and just immediately before.

The evidence of Bill Monroe and Riley Cecil was quite favorable to the defendant, Col Monroe, while the testimony of Bobby Vertrees, if true, would have been sufficient to sustain a verdict of guilty. There were no other witnesses to the events leading to the killing.

Bobby Vertrees had signed a written statement concerning the killing and the things that happened just before the shooting. He had testified on a former trial. It is contended that his testimony on this trial is at such variance with his testimony on the former trial and his previous written statement that it should be given no weight. Appellant cites authority for his contention. However, we find it unnecessary to determine the question. Let us look at Col Monroe's narration as given in the evidence:

"A. 19. * * * I was in the front seat with Carroll. He scooted over and we got in beside him, Carroll driving, Bill and I rode in the front seat. Cecil—Riley—more or less behind Bill and the boy behind his daddy, got on down the road somewhere along in there Mr. Cecil was thankin' me for waitin' on him all this time maybe a year or little longer.

"Q. 20. Waiting on him for what? A. Grocery bill, cigarettes and stock, what have you, that way.

"Q. 21. That's the account he had paid that day? A. Right. So he was thankin' me for this grocery bill, about waitin' on him, and I told him that was all right. And Vertrees spoke up and said, 'Well, I owe you a big grocery bill and I'm going to pay it.' I said, 'Well, Carroll, I guess you have told me fifty times that and you haven't paid it yet.'

"Q. 22. He did owe you a bill? A. Yes, sir.

"Q. 23. How long had the bill been running? A. Well, part of it since '52, I believe, '53 or '52 part of the bill was runnin' along, and after he had told so many times he would pay it and hadn't done it, I couldn't hardly

believe that he would. So I told him he had told me so many times I just couldn't believe it. Well, he said he was going to pay it anyhow. I finally told him—he said, 'You know I would have done paid you if I could.' Well, I still don't think he would have paid it if he could and I told him, 'Carroll, I just don't believe it.' 'Why?' 'Because you are just no good that's why.' And he said, 'Well, I don't give a damn if I never pay it.' Well, Mr. Cecil spoke up and said 'you are drunk' and made mention of his trouble in Texas, wished you wouldn't argue any more until he got out and I never said any more and probably a couple hundred feet, maybe not that much, all of a sudden he whipped the car over to the side of the road.

"Q. 24. Who is that? A. Vertrees, the driver. Vertrees was the driver.

"Q. 25. All right. A. Whipped the car off the side of the road, jumped out—climbed out real quick like, stripped his shirt, goes back to the car and pulls a wrecking bar from either underneath the seat, the front seat, or from the back of the front seat because it's a two door car and I didn't see where the bar came from, you know, whether under the front seat or in the floor of the back seat, I didn't see where the bar came from—and bounced back off into the road about the yellow line or stripe in the road and said, 'Old man, get out, one of us has to die.' I dropped my head down. I watched him. I knowed him for around ten years, and he said, 'Damn you old man, get out, one of us has got to die.' It was his car, I was riding with him, I didn't feel like it was my place to sit there.

"Q. 26. What did you do or try to do, Mr. Monroe? A. Sir?

"Q. 27. What did you do or try to do then? A. Well, I had the little 25 automatic sticking right under here. I just reached down and pulled the automatic out and dropped it down between my knees, like this, pulled it back enough to see if there was a shell in the barrel. I pulled it too far back and it jammed. I get that one on out and let another one go in the barrel and the other one dropped down in the floor, opened the door, got out of the car. He was there across the car from me standing at a little angle from the car, like this. He was off over, you might say, straight out in the street or a little out from the door out in the road with the bar, waving the bar, cursing me. I got out of the car and walked straight down the back of the car, got to the back of the car. He was comin' across almost to the back of the car and I goes on out by the side of the car, turned walking more or less sideways down the side and him saying 'one of us got to die, one of us has to die,' and I told him two or three times to stop he was getting so close. I fired one shot low to stop him. He didn't halt. I fired two more, just come up over his head with the bar like this and staggered backwards about four or five feet backwards, went backwards as he come up with the bar he staggered back and when he caught himself from going backwards he just twisted and fell on this shoulder."

■ The Commonwealth proved and Col Monroe admitted that he killed Carroll Vertrees. Testimony for the Commonwealth did not establish a justification for the killing. It therefore became the burden of Col Monroe to excuse or justify his act. Harvey v. Commonwealth, Ky., 318 S.W.2d 868. He undertook to do this by pleading self-defense, a plea recognized in the law as a fortress for the innocent, the peaceful and those wrongfully set upon. Harris v. Commonwealth, 140 Ky. 41, 130 S.W.801.

In the case of Schull v. Commonwealth, 310 Ky. 319, 220 S.W.2d 842, 844, this Court said:

"The testimony for the Commonwealth established the killing and the testimony for the defendant sought to establish that he acted in self defense. Where the accused admits or is shown by the evidence to have committed a homicide and seeks to justify it on the ground of self defense, it is incumbent on him to satisfy the jury that the killing was excusable and the defense must be convincingly established. The jury were not bound to accept his testimony that he acted in self defense and it is evident that they did not believe his testimony and concluded that the killing was unnecessary. We cannot say that the evidence was not sufficient to support the verdict or that it was given as a result of passion and prejudice." See also Baker v. Commonwealth, Ky., 322 S.W.2d 119.

Apparently, the jury in this case was not satisfied that the killing was excusable as an act of self-defense. The jury, from the defendant's testimony, could and did find that the killing resulted from an affray. From this same evidence the jury could well conclude that Col Monroe ignited the fire of this affray, and then placed himself in a position of danger with a predetermined purpose to shoot Vertrees and wrongfully use the doctrine of self-defense. Danger of great bodily harm could not have been reasonably apparent to him so long as he remained in the car or so long as he was on one side of the car and Vertrees on the other. He furtively girded himself for battle and walked into the open to meet his adversary. From the whole testimony the jury could have reasonably concluded that Col Monroe did not have to kill Carroll Vertrees in order to save himself from a danger reasonably apparent to him.

The trial judge was quite liberal with Col Monroe in giving an unqualified instruction on self-defense.

We find no error in the record. The judgment is affirmed.